UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NOEL MORAN ROJAS
    5412 56th Avenue
    Riverdale, Maryland 20737, U.S.A
    Prince George's County

MIGUEL HILARION JIMINEZ
    12314 Amanda Pine Dr.
    Houston, Texas 77089, U.S.A

OLIVIA ISABEL GONZALES
    14100 Willow Tank Dr.
    Austin, Texas 78717, U.S.A.

MAYRA LUISA CASTILLO CASTENEDA
    5933 N. Artesian Avenue
    Chicago, Illinois 60659, U.S.A.

LUZMARIA ARMENDAIZ DE ARROYO
    14100 Willow Tank Dr.
    Austin, Texas 78717, U.S.A.

PATRICIO MERCADO
    1700 E. 4th Street
    Austin, Texas 78702, U.S.A.

 and

ALEXANDRA ALMANZA
    2012 W. 17th Street
    Chicago, Illinois 60608, U.S.A.

individually, and on behalf of all others
similarly situated,

    Plaintiffs,

vs.

DELTA AIRLINES, INC.
    c/o CSC-Lawyers Incorporating Service Company
    7 St. Paul Street, Suite 820
    Baltimore, MD 21202

CASE NO:  8:19-cv-00665

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

UNITED AIRLINES, INC.
> c/o The Corporation Trust, Inc.
> 2405 York Road, Suite 201
> Lutherville-Timonium, MD 21093-2264

AMERICAN AIRLINES, INC.
> c/o The Corporation Trust, Inc.
> 2405 York Road, Suite 201
> Lutherville-Timonium, MD 21093-2264

AEROVIAS DE MEXICO S.A. DE C.V.
> c/o CT Corporation System
> 4701 Cox Road, Suite 285
> Glen Allen, VA 23060

ABC AEROLÍNEAS, S.A. DE C.V.
> c/o Mr. Manuel L. Rivero
> 1313 Ponce de Leon Blvd., Suite 201
> Coral Gables, Florida 33134

AEROENLACES NACIONALES, S.A. DE C.V.
> c/o Jarvis & Associates, P.A.
> 1550 Madruga Avenue, Suite 220
> Coral Gables, FL 33146

SOUTHWEST AIRLINES, CO.
> c/o The Prentice-Hall Corporation System, Maryland
> 7 St. Paul Street, Suite 820
> Baltimore, MD 21202

And

JETBLUE AIRWAYS CORPORATION
> c/o National Registered Agents, Inc. of Maryland
> 2405 York Road, Suite 201
> Lutherville-Timonium, MD 21093-2264

> Defendants.

---

## **COMPLAINT**

Plaintiffs Noel Moran Rojas, Miguel Hilarion Jiminez, Olivia Isabel Gonzales, Mayra Luisa Castillo Casteneda, Luzmaria Armendaiz De Arroyo, Patricio Mercado, and Alexandra Almanza, individually and on behalf of the class of injured persons they represent – for their Complaint against defendants Delta Airlines, Inc. ("Delta"); United Airlines, Inc. ("United"); American Airlines, Inc. ("American"); Aerovias De Mexico S.A. De C.V., Inc. ("AeroMexico"); ABC Aerolíneas, S.A. De C.V. ("Interjet"); Aeroenlaces Nacionales, S.A. De C.V. ("Viva Aerobus"); Southwest Airlines, Co. ("Southwest"); and JetBlue Airways Corporation ("jetBlue"), (collectively, "defendants" or "defendant airlines") allege as follows:

## I.      INTRODUCTION

1.      The plaintiffs are Mexican citizens who now live or previously lived in the United States.  They represent a putative class of primarily Mexican citizens who, like plaintiffs themselves, flew to Mexico from the United States as ticketed passengers on one or more of the defendants' airlines.  Mexico has historically charged a tourism tax for non-Mexican citizens entering its country.  The defendants, through a common fraudulent scheme, charged them this tourism tax even though it was not owed by Mexican citizens, and then kept that money for themselves.  Most or all of the defendants continue to use this scheme to unlawfully collect money from unwitting Mexican-citizen passengers for a tax they do not owe, apparently believing a loophole in the laws of the fifty states, purportedly formed through the intersection of the Airline Deregulation Act's preemption clause (49 U.S.C. § 41713(b)(1)) with various state statutes and common laws intended to prevent this very type of unlawful behavior, protect them from any consequences.

2.      Starkly put, for many years the defendant airlines have stolen money from Mexican citizens and others under the guise of a Mexican government-required tax, and then kept that money for themselves.

3.      This scheme came about through a contractual arrangement that defendants collectively negotiated with the Mexican government.  Defendants are members of "Camera Nacional de Aerotransportes" ("CANAERO"), an association of airlines that transport passengers to and from different countries, including Mexico and the United States.

4.      CANAERO, and each of the defendants here, executed a self-imposed undertaking – a contract with the Mexican government, initially in 1999 ("the CANAERO Agreement"), under which each agreed to collect a Mexico Tourism Tax (also referenced here as "the Tax,") on behalf of the Mexican government from certain persons traveling on flights to Mexico from the United States.  Defendants were then to deliver the collected fees to the Mexican government.  There is no provision in the CANAERO Agreement, or any other known agreement, that allows the defendants to collect the Tax from Mexican citizens, and there is no provision in the CANAERO Agreement, or any other agreement, that allows the defendants to keep the Tax for themselves.

5.      The terms of the CANAERO Agreement contain three material requirements relevant to this class action lawsuit.  First, the CANAERO Agreement prohibited defendants from collecting the Tax from certain categories of passengers (citizens of Mexico and children under the age of two, among others, hereafter "Exempt Traveler(s)").  Second, the CANAERO Agreement required defendants to implement mechanisms to distinguish the travelers to whom the Tax does not apply (i.e., the Exempt Travelers).  Third, the CANAERO Agreement required defendants to ensure that a refund was provided to Exempt Travelers if the Tax was inadvertently collected from them.

6.      None of the defendant airlines complied with any of these requirements of their self-imposed undertaking that allowed them to collect the Tax in the first place.  Instead, (1) each defendant failed to implement any cognizable system to distinguish between exempt and non-exempt passengers for the purpose of avoiding a tax charge to passengers who owe no tax, (2) each defendant routinely and unlawfully charges Exempt Travelers the Tax, and (3) none of the defendants have any meaningful system in place to refund the tax monies to the Exempt Travelers.  Absent from the face of the travel tickets, but buried in the invoice details of the costs and fees of each ticket purchased by air travelers to Mexico, is a line item for a Mexican Tourism Tax, usually assessed against each traveler in amounts typically ranging between $20 and $30.

7.      But every defendant airline can and does determine which passengers are exempt.  They do this so that they can determine how much of the money they collect as a Tourism Tax to remit to the Mexican government, and *how much of the improperly collected tax funds they can keep for themselves*.  After each flight from the United States to Mexico, each defendant reports to Mexico the total number of passengers on each flight, and the number of passengers from whom the Tax should have been collected.  The defendants do not pay to Mexico the taxes they charged to Exempt Travelers.  Instead, all of the defendants brazenly keep the ill-gotten tax funds for themselves, making no attempt to remit the funds to the improperly charged passengers or Mexico.  In practice, the scheme has created a nearly cost-free profit center for defendants through a uniform and artificially fixed surcharge to air fare for Mexican citizens flying from the United States to Mexico.

8.      The defendant airlines perfected this scheme, and maintained this scheme, in a coordinated fashion, and by agreement among the defendants.  They needed this close cooperation because without it, at least two situations would result.  First, and at least in the earlier stages of

the scheme, if any one of them had done so alone, without coordination among the other defendant members of CANAERO, it would be in serious danger of being turned in by its competitors to Mexican authorities.  Second, if only one of them used this outrageous practice of overcharging each Exempt Traveler $25 per ticket, it would be at a competitive disadvantage to the other carriers. If the airlines could fix the overcharge price the same for each or most of them, then passengers would have few, if any, alternate choices.

9.      As Mexico eventually caught wind of certain anomalies surrounding defendants' compliance with their contractual obligations, defendants coordinated their responses.[1] Throughout the years, defendants were confronted by Mexican authorities who suspected defendants were unlawfully charging the Tax to Exempt Travelers.  Defendants at times refused to provide a cogent response, or at other times promised they would cease the improper practice. They did not. When questioned together and separately by Mexican authorities and other representatives about their tax collection procedures, defendants either lied about their system, or refused to provide accurate information to the Mexican authorities.  Defendants then jointly decided to resist any attempt by Mexican authorities to deny their ability to collect the Tax, and kept the terms of their contract with the Mexican government secret from the public.

10.      Certain of the defendants affirmatively concealed the existence of the CANAERO Agreement in a bid to prevent plaintiffs from attacking their fraudulent tax-collection practice. Various Exempt Travelers brought state law-based causes of action, including breach of contract lawsuits against members of CANAERO, including two defendants here (AeroMexico and Delta), related to the improper collection of the Tax.  *See Sanchez v. Aerovias de Mexico, S.A. De C.V.,*

---

[1] Mexican authorities have indicated they are not claiming an interest in any of the improperly charged funds that are the subject of this action because those funds do not belong to Mexico.

590 F.3d 1027 (9th Cir. 2010); *McMullen v. Delta Airlines, Inc.*, 361 Fed.Appx. 757 (9th Cir. 2010).  In each case, the courts determined the dispute was subject to the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1) (the "ADA"), and held that the plaintiffs' cases were not exempted from the ADA due, in part, to the fact that the airlines had undertaken no self-imposed obligation *not to collect* the Tax from Exempt Travelers to Mexico.

11.     To plaintiffs' knowledge, the defendants in those cases, while acknowledging the existence of the Tax and an agreement, fraudulently concealed and never disclosed the terms of the CANAERO Agreement or that the airlines had willingly undertaken the obligation to refrain from collecting the Tax from Exempt Travelers (*i.e.*, the putative class members).  Instead, the defendants in those actions remained silent.

12.     To be clear, the defendant airlines agreed among themselves, and coordinated their efforts, to each charge the Tax that was not owed to Mexican citizens, to each keep the unlawfully collected funds for themselves, to resist efforts by Mexico to extinguish their authority to collect the Tax on behalf of Mexico, and to each employ a relatively uniform method of illegally charging the Tax to Mexican citizens and retaining those funds.

13.     Defendants appointed a managing director of their CANAERO organization. Each of the defendant airlines, as well as their appointed CANAERO representative, have met with representatives from the Commissioner of the National Institute of Migration ("INM") in Mexico on numerous occasions.  During those meetings, at least, each of the airline representatives agreed with the others that they were improperly collecting the Tax, agreed with the others that they would conceal their illegal activity from the public, agreed they would cooperate with each other to keep the funds for themselves, agreed they would each not establish a reasonable means to avoid charging Exempt Travelers the Tax, agreed they would each not establish a reasonable means to

refund the Tax to Exempt Travelers and agreed they would oppose the cessation of their right to charge any Tourism Tax under the CANAERO Agreement. The defendant airlines jointly conveyed this opposition to Mexico through their appointed CANAERO representatives.

14.     Furthermore, the defendants organized themselves in committees and sub-committees to manage their Tax scheme, collectively made representations to, and discussed with, the Mexican government concerning the Tax, agreed on common tax collection procedures, instructed their CANAERO representative on their joint positions with respect to the Tax, collectively understood they had no right to collect the Tax from Exempt Travelers, refused to explain to their own representative why they were not following the proper procedures to avoid collecting the Tax from Exempt Travelers, and collectively agreed to keep their contractual obligations concerning the Tax secret from the public.

15.     A group of Mexican citizens previously challenged the defendants' scheme in a putative civil RICO class action lawsuit filed in the Eleventh Circuit. That court ultimately upheld a dismissal of the action because, it reasoned, the enterprise element of civil RICO was not plausibly pleaded. *Almanza v. United Airlines, Inc*. 851 F.3d 1060 (11th Cir. 2017). The Eleventh Circuit concluded by noting "Defendants' conduct stated by the plaintiffs regarding the Mexico Tourism Tax is very troubling" but believed plaintiffs' "pleadings were insufficient to allow RICO to serve as a vehicle for addressing that conduct." *Id.* at 1075. This class action lawsuit alleges significant additional facts that establish the defendant airlines acted by agreement in a coordinated effort to maintain their scheme of fleecing money from Exempt Travelers. There is no question these defendants acted as an enterprise, separate and apart from their existence as legitimate air carriers, to conduct this scheme.

16.     This lawsuit also recognizes the defendants' scheme unlawfully fixes prices for travel from the United States to Mexico through the uniform application of the unlawful Tax. Finally, this lawsuit recognizes the exception noted by the Supreme Court in *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) to ADA preemption – the ADA does not bar adjudication of "the airline's breach of its own, self-imposed undertakings." *Id.* at 220.  Among the factual bases of this lawsuit are defendants' multiple breaches of the self-imposed undertakings made by the airlines to gain the right to charge the Tax at issue.

## II.     THE PARTIES

### PLAINTIFFS

17.     The following named plaintiffs bring this action individually and on behalf of the class of injured persons they represent as defined in this Complaint ("plaintiffs").  The plaintiffs purchased airfare from the defendants for flights from the U.S. to Mexico.

18.     Plaintiff Noel Moran Rojas is a Mexican citizen lawfully residing at 5412 56th Avenue, Riverdale, Maryland 20737, U.S.A.  Mr. Rojas has flown to Mexico numerous times on one or more Defendant airlines, including Delta Airlines, and was improperly assessed the Mexico Tourism Tax.

- On May 25, 2018, Mr. Rojas booked a flight for travel on June 9, 2018, from Baltimore, Maryland, to Mexico City, Mexico on Delta Flight #5276.  At that time, Delta issued a fare ticket to Mr. Rojas that included and indicated he owed a tourism tax to Mexico, and that Delta had the authority to collect this tax from Mr. Rojas for the benefit of Mexico.  Through a ticket issued with eTicket# 0062326421907, Delta unlawfully collected from Mr. Rojas this "Mexico Tourism Tax" in the amount of $29.05.  At the time, Delta knew or should have known that Mr. Rojas did not owe a tourism tax to Mexico, and that Delta intended to keep the unlawfully charged tax funds for itself.  If Delta had not unlawfully charged the Mexico Tourism Tax to Mr. Rojas, he would not have paid the tax amount to Delta.  On information and belief, Delta filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Rojas as a citizen of Mexico and kept the amount of the unlawfully-collected tax.

19.     Plaintiff Miguel Hilarion Jimenez is a Mexican citizen lawfully residing at 12314 Amanda Pine Dr., Houston, Texas 77089, U.S.A Mr. Jimenez has flown to Mexico numerous times on one or more defendant airlines, including AeroMexico and Interjet, and was improperly assessed the Mexico Tourism Tax by these airlines.

- On October 4, 2018, Mr. Jimenez booked a flight for travel on October 12, 2018, from Houston, Texas, to Mexico City, Mexico on AeroMexico Flight #471.  At that time, AeroMexico issued a fare ticket to Mr. Jimenez that included and indicated he owed a tourism tax to Mexico, and that AeroMexico had the authority to collect this tax from Mr. Jimenez for the benefit of Mexico.  Through a ticket issued with eTicket# 1392107810748, AeroMexico unlawfully collected from Mr. Jimenez this "Mexico Tourism Tax" in the amount of $28.00.  At the time, AeroMexico knew or should have known that Mr. Jimenez did not owe a tourism tax to Mexico, and that AeroMexico intended to keep the unlawfully charged tax funds for itself.  If AeroMexico had not unlawfully charged the Mexico Tourism Tax to Mr. Jimenez, he would not have paid the tax amount to AeroMexico.  On information and belief, AeroMexico filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Jimenez as a citizen of Mexico, and kept the amount of the unlawfully-collected tax.

- Mr. Jimenez also booked a flight for travel on February 14, 2019, from Houston, Texas, to Mexico City, Mexico on Interjet Flight #3987.  At that time, Interjet issued a fare ticket to Mr. Jimenez that included and indicated he owed a tourism tax to Mexico, and that Interjet had the authority to collect this tax from Mr. Jimenez for the benefit of Mexico.  Through a ticket issued with booking code HYU7GG, Interjet unlawfully collected from Mr. Jimenez this "Mexico Tourism Tax" in the amount of $27.69.  At the time, Interjet knew or should have known that Mr. Jimenez did not owe a tourism tax to Mexico, and that Interjet intended to keep the unlawfully charged tax funds for itself.  If Interjet had not unlawfully charged the Mexico Tourism Tax to Mr. Jimenez, he would not have paid the tax amount to Interjet.  On information and belief, Interjet filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Jimenez as a citizen of Mexico and kept the amount of the unlawfully-collected tax.

20.     Plaintiff Olivia Isabel Gonzales is a Mexican citizen lawfully residing at 14100 Willow Tank Dr., Austin, Texas 78717, U.S.A.  Ms. Gonzales has flown to Mexico numerous times on one or more Defendant airlines, including United Airlines, and was improperly assessed the Mexico Tourism Tax.

- On August 31, 2016, Ms. Gonzales booked a flight for travel on February 8, 2017, from Houston, Texas, to Cancun, Mexico on United Flight #1086. At that time, United issued a fare ticket to Ms. Gonzales that included and indicated she owed a tourism tax to Mexico, and that United had the authority to collect this tax from Ms. Gonzales for the benefit of Mexico. Through a ticket issued with eTicket# 0162316223021, United unlawfully collected from Ms. Gonzales this "Mexico Tourism Tax" in the amount of $20.98. At the time, United knew or should have known that Ms. Gonzales did not owe a tourism tax to Mexico, and that United intended to keep the unlawfully charged tax funds for itself. If United had not unlawfully charged the Mexico Tourism Tax to Ms. Gonzales, she would not have paid the tax amount to United. On information and belief, United filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. Gonzales as a citizen of Mexico, and kept the amount of the unlawfully-collected tax.

21.     Plaintiff Mayra Luisa Castillo Casteneda is a Mexican citizen lawfully residing at 5933 N. Artesian Avenue, Chicago, Illinois 60659, U.S.A.  Ms. Casteneda has flown to Mexico numerous times on one or more Defendant airlines, including Southwest Airlines, and was improperly assessed the Mexico Tourism Tax.

- On September 21, 2016, Ms. Casteneda booked a flight for travel on October 16, 2015, from Chicago, Illinois, to Mexico City, Mexico on Southwest Flight #3086. At that time, Southwest issued a fare ticket to Ms Casteneda that included and indicated she owed a tourism tax to Mexico, and that Southwest had the authority to collect this tax from Ms. Casteneda for the benefit of Mexico. Through a ticket issued with eTicket # 5268502253828, Southwest unlawfully collected from Ms. Casteneda this "Mexico Tourism Tax" in the amount of $20.11. At the time, Southwest knew or should have known that Ms. Casteneda did not owe a tourism tax to Mexico, and that Southwest intended to keep the unlawfully charged tax funds for itself. If Southwest had not unlawfully charged the Mexico Tourism Tax to Ms. Casteneda, she would not have paid the tax amount to Southwest. On information and belief, Southwest filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. Casteneda as a citizen of Mexico, and kept the amount of the unlawfully-collected tax.

22.     Plaintiff LuzMaria Armendaiz De Arroyo is a Mexican citizen lawfully residing at 14100 Willow Tank Dr., Austin, Texas 78717, U.S.A.  Ms. De Arroyo has flown to Mexico numerous times on one or more Defendant airlines, including United Airlines, and was improperly assessed the Mexico Tourism Tax.

- On April 11, 2016, Ms. De Arroyo booked a flight for travel on April 17, 2016, from Monterey, Mexico, to Houston, Texas, on United Flight #557, with a return flight from Houston, Texas, to Mexico City, Mexico, on United Flight #5521. At that time, United issued a fare ticket to Ms. De Arroyo that included and indicated she owed a tourism tax to Mexico, and that United had the authority to collect this tax from Ms. De Arroyo for the benefit of Mexico. Through a ticket issued with eTicket# 0162488136879, United unlawfully collected from Ms. De Arroyo this "Mexico Tourism Tax" in the amount of $22.07. At the time, United knew or should have known that Ms. De Arroyo did not owe a tourism tax to Mexico, and that United intended to keep the unlawfully charged tax funds for itself. If United had not unlawfully charged the Mexico Tourism Tax to Ms. De Arroyo, she would not have paid the tax amount to United. On information and belief, United filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. De Arroyo as a citizen of Mexico and kept the amount of the unlawfully-collected tax.

23.     Plaintiff Patricio Mercado is a Mexican citizen lawfully residing at 1700 E. 4th Street, Austin, Texas 78702, U.S.A. Mr. Mercado has flown to Mexico numerous times on one or more Defendant airlines, including Viva Aerobus, and was improperly assessed the Mexico Tourism Tax.

- On or about February 27, 2015, Mr. Mercado booked a flight for travel on February 27, 2015, from Houston, Texas to Monterrey, NL Mexico on Viva Aerobus Flight Nos. VIV1951 and VIV1950. At that time, Viva Aerobus issued a fare ticket to Mr. Mercado that included and indicated he owed a tourism tax to Mexico, and that Viva Aerobus had the authority to collect this tax from Mr. Mercado for the benefit of Mexico. Through a ticket issued with "Factura No. 22496786," Viva Aerobus unlawfully collected from Mr. Mercado this "Mexico Tourism Tax" in the amount of $342.12 Pesos. At the time, Viva Aerobus knew or should have known that Mr. Mercado did not owe a tourism tax to Mexico, and that Viva Aerobus intended to keep the unlawfully charged tax funds for itself. If Viva Aerobus had not unlawfully charged the Mexico Tourism Tax to Mr. Mercado, he would not have paid the tax amount to Viva Aerobus. On information and belief, Viva Aerobus filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Mr. Mercado as a citizen of Mexico and kept the amount of the unlawfully-collected tax.

24.     Plaintiff Alexandra Almanza is a Mexican citizen lawfully residing at 2012 W. 17th Street, Chicago, Illinois 60608, U.S.A. Ms. Almanza has flown to Mexico numerous times on one

or more Defendant airlines, including jetBlue and American Airlines, and was improperly assessed

the Mexico Tourism Tax.

- Ms. Almanza booked a flight for travel on June 20, 2018, from Washington, D.C., to Mexico City, Mexico on jetBlue Flight #1223. At that time, jetBlue issued a fare ticket to Ms. Almanza that included and indicated she owed a tourism tax to Mexico, and that jetBlue had the authority to collect this tax from Ms. Almanza for the benefit of Mexico. Through a ticket issued with confirmation code CVUTLS, jetBlue unlawfully collected from Ms. Almanza this "Mexico Tourism Tax" in the amount of $27.40. At the time, jetBlue knew or should have known that Ms. Almanza did not owe a tourism tax to Mexico, and that jetBlue intended to keep the unlawfully charged tax funds for itself. If jetBlue had not unlawfully charged the Mexico Tourism Tax to Ms. Almanza, she would not have paid the tax amount to jetBlue. On information and belief, jetBlue filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. Almanza as a citizen of Mexico and kept the amount of the unlawfully-collected tax.

- Ms. Almanza also booked a flight for travel on January 19, 2019, from Chicago, Illinois, to Mexico City, Mexico on American Flight Nos. 328 (Chicago to Dallas) and 309 (Dallas to Mexico City). At that time, American issued a fare ticket to Ms. Almanza that included and indicated she owed a tourism tax to Mexico, and that American had the authority to collect this tax from Ms. Almanza for the benefit of Mexico. Through a ticket issued by American, American unlawfully collected from Ms. Almanza this "Mexico Tourism Tax" in the amount of $27.69. At the time, American knew or should have known that Ms. Almanza did not owe a tourism tax to Mexico, and that American intended to keep the unlawfully charged tax funds for itself. If American had not unlawfully charged the Mexico Tourism Tax to Ms. Almanza, she would not have paid the tax amount to American. On information and belief, American filed a flight manifest upon landing, or soon thereafter, with the Mexican immigration authorities which listed Ms. Almanza as a citizen of Mexico, and kept the amount of the unlawfully-collected tax.

## **DEFENDANTS**

25.     Defendant Delta is a Delaware corporation headquartered in Atlanta, Georgia, that

has been, at all material times, registered to do business, and actually has done business, in this

District. Delta also has, at all material times, offered and sold airfare for flights from the United

States to Mexico to passengers (including but not limited to Mexican citizens) in this District.

Delta Airlines, Inc. may be served through its registered agent in this District: CSC-Lawyers Incorporating Service Company; 7 St. Paul Street, Suite 820; Baltimore, MD 21202.

26.     Defendant United is a Delaware corporation headquartered in Chicago, Illinois, that has been, at all material times, registered to do business, and actually has done business, in this District. United also, at all material times, has offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican Citizens) in this District. United may be served through its registered agent in this District: The Corporation Trust, Inc.; 2405 York Road, Suite 201; Lutherville-Timonium, MD 21093-2264.

27.     Defendant American is a Delaware corporation headquartered in Dallas, Texas, that has been, at all material times, registered to do business, and actually has done business, at all material times, in this District. American also, at all material times, has offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican citizens) in this District.   In December 2015, American absorbed by merger Defendant US Airways, and so is liable for US Airways as its successor in interest. American (and consequently its absorbed constituent US Airways for which American is the successor in interest) may be served through its registered agent in this District: The Corporation Trust, Inc.; 2405 York Road, Suite 201; Lutherville-Timonium, MD 21093-2264.

28.     Defendant Aeromexico is a Mexican corporation with its principal U.S. headquarters in Houston, Texas, that is also registered to do business in Virginia and that has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican citizens) in this District.[2] Aeromexico, moreover, also has more-than-minimum contacts with the United States in general and this District (and

---

[2] *See*, *e.g*.: https://flights.aeromexico.com/en-us/flights-to-baltimore (last accessed Feb. 21, 2019)

Circuit) in particular. Apart from being amenable to service and jurisdiction in this District via 18 U.S.C. § 1965(d) of the RICO Act[3], Aeromexico also may be served through its Virginia registered agent: CT Corporation System; 4701 Cox Road, Suite 285; Glen Allen, VA 23060.

29.    Defendant Interjet is a Mexican corporation doing business in the United States that has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican citizens) in this District and has more-than-minimum contacts with the United States. Apart from being amenable to service and jurisdiction in this District via 18 U.S.C. § 1965(d) of the RICO Act[4], Interjet also may be served through its registered agent in the United States: Mr. Manuel L. Rivero; 1313 Ponce de Leon Blvd., Suite 201; Coral Gables, Florida 33134.

30.    Defendant Viva Aerobus is a Mexican corporation doing business in the United States that has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican citizens) in this District and has minimum contacts with the United States. Apart from being amenable to service and jurisdiction in this District via 18 U.S.C. § 1965(d) of the RICO Act[5],Viva Aerobus also may be served through its registered agent in the United States: Jarvis & Associates, P.A.; 1550 Madruga Avenue, Suite 220; Coral Gables, FL 33146.

31.    Defendant Southwest is a Delaware corporation with its principal office in Dallas, Texas, that does business in the United States. Southwest has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited

---

[3] See, e.g., Hengle v. Curry, No. 3:18-CV-100, 2018 WL 3016289, at *8–9 (E.D. Va. June 15, 2018).

[4] See n. 3, supra.

[5] See n. 3, supra.

to Mexican citizens) in this District and is a corporate resident of the United States. Southwest may be served through its registered agent in this District: The Prentice-Hall Corporation System, Maryland; 7 St. Paul Street, Suite 820; Baltimore, MD 21202.

32.     Defendant jetBlue is a Delaware corporation with its principal office in Forest Hills, New York. jetBlue does business in the United States and has, at all material times, offered and sold airfare for flights from the United States to Mexico to passengers (including but not limited to Mexican citizens) in this District and is a United States corporate resident. jetBlue may be served through its registered agent in this District: National Registered Agents, Inc. of Maryland; 2405 York Road, Suite 201; Lutherville-Timonium, MD 21093-2264.

## III.     JURISDICTION AND VENUE

33.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331.  This Court also has jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

34.     This Court has personal jurisdiction over defendants because defendants have submitted to the jurisdiction of the Court by virtue of their extensive business practices in this District.  This Court has general and/or specific personal jurisdiction over defendants because defendants continuously and systematically engaged, and continue to engage, in business in this District.  That business specifically includes offering for sale, and actually selling, airfare that improperly includes the Tax to residents of this District, in transactions occurring in this District, and for flights departing from this District.  Each defendant directly or indirectly sold passenger air transportation services in this District, including to Exempt Travelers, and has substantial aggregate contacts with this District, and/or engaged in illegal price-fixing and/or conspired to

commit RICO violations, that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District. This Court also has personal jurisdiction over defendants because, pursuant to 18 U.S.C. § 1965(a), (b), and (d)[6] all of the defendants, at all times material to this complaint, continuously and systematically conducted business or "transact[ed] affairs" in this District, and/or had minimum contacts with the United States. The same is true under 15 U.S.C. §22, which provides that, in "any suit, action, or proceeding under the antitrust laws against a corporation," personal jurisdiction and service of process is available in any district where a corporate defendant "may be found" and/or "transacts business."

35.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) and/or (b)(3), (c) and (d), under the RICO Act's venue provision (18 U.S.C. § 1965), and pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), because Defendants reside, transact business, are found within, and/or have agents within this District and a substantial part of the events giving rise to plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

---

[6] RICO's section 1965(d) provides that process may be served "in any judicial district of the United States" when required by the "ends of justice," and also allows process service "in any judicial district in which such person resides, is found, has an agent, or transacts affairs." U.S. courts, including the Fourth Circuit, accordingly have long held that such "nationwide service of process" provisions (as in RICO and the ERISA statute) also confer personal jurisdiction over a defendant in any judicial district, so long as the defendant has minimum contacts with the United States. *See Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443 (4th Cir. 2015).

IV.     **FACTS**

A. SUMMARY

36.     This class action arises out of a scheme developed and implemented in continuous, systematic, cooperation by the defendants, at the time of selling an airfare ticket, to knowingly and wrongfully charge a Mexican government "tax" to passengers that did not owe a tax, and to keep the funds for themselves.  Absent from the face of the tickets, but buried in the details of the costs and fees of each ticket purchased by plaintiffs and the class they represent, is a line item for a Mexico Tourism Tax (an amount that varies, but that is usually between $20.00 and $30.00) that defendants know is not applicable to plaintiffs.  Since 1999, these defendants have collected this Tax from every passenger who flew on their airline into Mexico, including Exempt Travelers, and simply kept the revenue collected from Exempt Travelers.

37.     Defendants have engaged in a multi-year, multi-million dollar scheme to artificially and uniformly inflate air transportation prices for Exempt Travelers and thereby deprive the plaintiffs and the class they represent of the fair market price for air travel to Mexico by collecting the Tax from Exempt Travelers and in concert with each other and through CANAERO, retain the illegally-collected tax funds.

38.     The plaintiffs and each of the putative class members were injured in exactly the same manner – the defendants made each pay money that was not owed as a condition of travel to Mexico from the United States, and retained that money, by fraudulently representing it was a tax which the defendants had both the authority to, and were required to collect from the class, but which the class did not owe.

39.     Defendants are each international air transportation companies. For relevant years, each defendant is or was a member of CANAERO.  CANAERO performs a variety of legitimate

functions for the defendant airlines, but for purposes of the scheme alleged herein, served as defendants' agent to obtain a valuable concession from the Mexican government: the ability to add to every ticket sold to a non-Exempt Traveler flying from or through the United States and landing in Mexico the $20-$30 Mexico Tourism Tax. That ability arose through an agreement, described in detail below, that was negotiated by a group of the defendants through an administrator at CANAERO with the Mexican INM.

40.      Those defendants who initially negotiated the agreement (AeroMexico, United, Delta, and American, by and through U.S. Airways) knew that the Government of Mexico did not want or intend to have the agreement serve as a pretext for the airlines to collect the Tax from Exempt Travelers.   These five airlines knew and understood from the day they signed the agreement that by collecting the Tax from every passenger, that the tax was being improperly and fraudulently assessed, and that the agreement gave them no right to do so.

41.      Worse, once the Exempt Travelers paid the charged Tax, as they had no choice but to do if they wanted to fly into Mexico, the defendant airlines simply kept the money. The airlines did not even pretend that there was an administrative reason why they had to collect the money, nor did they advise the Exempt Travelers how to obtain a refund in any meaningful way. Instead, some of the defendant airlines, at best, set up a nearly impossible-to-find refund procedure, arbitrarily capped the time for a passenger to request a refund (for example United requires a passenger to submit a request within 12 months), and kept all funds it unlawfully collected.

42.      Since 1999 the defendants, on information and belief, have obtained, retained, and reinvested the Tax they stole from Exempt Travelers into their respective operations and CANAERO.  Throughout the period of the CANAERO Agreement, despite collecting, registering, knowing, and/or having constructive knowledge of their passengers' passport numbers and

nationalities (information collected online or by sales agents when the passengers bought their tickets to Mexico) the defendants systematically and improperly: (1) charged Exempt Travelers the Tax, (ii) concealed from Exempt Travelers that they were not subject to the Tax, (iii) failed to offset ticket prices charged for such Exempt Travelers, and (iv) failed to refund the Tax.

43.      Each of the defendant airlines participated in the scheme to defraud, the RICO enterprise, and the illegal price-fixing scheme described in this Complaint.  Each defendant airline was unjustly enriched by their scheme to defraud and the illegal price-fixing scheme, and are holding money that rightfully belongs to the plaintiffs and the class they represent.

**B.  CANAERO**

44.      CANAERO is a Mexican legal entity which holds itself out as an entity organized under Mexican laws. Its self-described  purpose (as translated by Google Translate) is,  to "be a strong, plural and participatory Chamber that promotes and defends the interests of the airline industry by being a consultative body and source of information on the sector and collaborating with the authorities in the design, dissemination and execution of policies, programs and instruments for the sustainable development of air transport in Mexico."[7]

---

[7]*See* http://canaero.org.mx/nosotros/ (last accessed Feb. 22, 2019).  Under "Goals" it reads:
Represent, promote and defend the general interests of the national and international aviation industry, putting the public interest over the private one.
Promote the activities of its affiliates in Mexico and abroad.
To be a consultative and collaborative body of the authorities for the design, dissemination and execution of policies, programs and instruments for the development of air transport.
Promote, guide and provide training on the implementation of administrative procedures before the authorities, in order to generate a culture of responsibility and compliance with the legislation and regulation of the airline industry.
Be a source of statistical, legislative and regulatory information on the airline industry.

45.     At all relevant times CANAERO was comprised of more than 30 national and international commercial airlines, which transport both passengers and freight, from international locations, including the United States, and into Mexico.

46.     At all relevant times, CANAERO has been governed by a Board of Directors, comprised of members of a number of the airlines that fly passengers into Mexico from the United States. The current Board is or was comprised of representatives of AeroMexico, Volaris, United, and American (all but Volaris are defendants in this action). These airlines have significant power which enables them to control the CANAERO organization.

47.     At all relevant times, CANAERO members have organized themselves into various committees and sub-committees that include committees for technical issues, legal issues, administrative issues, and others, each of which is related to some aspect of an overall political trade and advocacy group of the various commercial airlines operating flights from and within Mexico. Each airline has appointed at least one and often more individuals to act as that airline's designated representative to the CANAERO organization.

48.     While representatives of various airline members actually perform substantive committee tasks relevant to their particular assignment, CANAERO also maintains its own so-called "House Staff" of professionals.

49.     At all relevant times, between 1992 and July 2012, one such "House Staff" member was the Managing Director of CANAERO, Gabriel Ortega Alcocer ("Mr. Alcocer"). Mr. Alcocer's duties included representing CANAERO's members before the Mexican government, agencies, and private companies on such subjects as the airline members desired.  Mr. Alcocer thus became an intermediary and agent, as needed, for the member airlines on these issues.

50.     Mr. Alcocer chaired a number of meetings with the appointed representatives of the airlines identified above to discuss the subject of the Tax and its collection by the airlines. For convenience, the meetings were often held at the offices of the INM, the Mexican agency that is charged by the Government of Mexico to actually collect the Tax charged to non-exempt travelers.

51.     The precise identity of the airline representatives who met with Mr. Alcocer in 1998 is currently not known. However, each such representative was authorized, by virtue of her participation in the meetings as part of CANAERO, to speak for each of their respective airlines' interests. It was common practice at the time that each airline had its own representative(s), and that on subjects of common interest, the representatives for the various defendants would jointly meet with each other and Mr. Alcocer. In other words, for purposes of various issues of common interest, in spite of the fact that the defendant airlines otherwise competed over service to Mexico, the airlines, through their representatives, indicated to Mr. Alcocer that they had a common interest in obtaining a concession from the Government of Mexico to collect the Tax.

52.     The INM did not attend these meetings.  The purpose of the meetings was for the participating airlines' representatives to privately discuss and strategize which concessions they needed from the INM, and how to obtain them. Mr. Alcocer attended the meetings and the group decided he would become the negotiator with an eye towards drafting and overseeing the execution of a formal agreement with the Government of Mexico that would detail how the airlines would collect, handle, report, and transfer the Tax funds to the Mexican authorities.

53.     The defendant airlines instructed Mr. Alcocer to negotiate the member airlines' interests in formalizing a written agreement with the INM. Before the agreement was actually negotiated, each member airline, including specifically defendants AeroMexico, American, United, Delta, and American by and through U.S. Airways, agreed that the Tax procedure would

apply equally to each airline and none of the airlines would have an advantage or disadvantage against each other with respect to the collection of the Tax, and authorized Mr. Alcocer to negotiate such agreement with the Government of Mexico.

54.     Each member airline had at least one representative who met with the others and Mr. Alcocer. The identities of some of the airline representatives who regularly met after 2008, and continued to do so until at least the filing of this lawsuit were as follows: for Aero Mexico, Dr. Andres Conesa Labastida, Lic. Edmundo Olivares Dufoo, Lic. Gloria Mendoza Villava, Lic. Raquel Jurado, Lic. Alejandro Avalos Bolanos, and Gustavo Roche; for American, Lic. Monica Rocio Parra Menchaca, Renatto Rojas Rodriguez, and Lic. Lorena Guerra; for US Airways (now American Airlines), C.P. Oscar Armando Avila Beltran, Daniel Gonzalez, and Alondra Castillo; for Delta, Lic. Jorge Mercado Cuellar, Peter Van Der Lende, Sr. Carlos Landergren, and Sr. Kajim Shajid Cruz Carillo; and for United, Mireya Corro. As smaller and later members joined CANAERO, they were represented by individual designated representatives as, for example, for Mesa Airlines (advancing the interests of United Airlines), Lic. Raul Crisogono Montes Elizondo, and C.P. Zezart Merino Diaz.

### C.  NEGOTIATION OF CANAERO AGREEMENT

55.     Following the meetings described above, in 1999, Mr. Alcocer represented the participating airlines in connection with negotiating the CANAERO Agreement.  In so doing, Mr. Alcocer conveyed the airlines' joint position and made representations to the Mexican government of the airlines' future undertaking with respect to the collection and treatment of the Tax.

56.     Mr. Alcocer transmitted the INM's positions to representatives of each participating airline as the negotiations took place. In turn, the representatives of the airlines which had authorized Mr. Alcocer to negotiate on their behalf, instructed Mr. Alcocer on the airlines'

joint positions. Mr. Alcocer was not authorized to bind the airlines until he was given express permission to do so.

57.     Beginning on or about June 30, 1999 (or about the dates that each defendant began operating flights to/from Mexico), defendants became formal signatories to the "CANAERO Agreement."[8]   The CANAERO Agreement was signed by Mr. Alcocer with the authority of the member airlines.

### D.  CRITICAL TERMS OF CANAERO AGREEMENT

58.     The CANAERO Agreement specifically identified certain groups of individuals from whom the CANAERO airlines could not collect the Tax.  This group of individuals, the Exempt Travelers, include the plaintiffs and the class they represent (*i.e.,* citizens of Mexico, children under the age of two, and foreigners with resident status in Mexico).  Thus, under the CANAERO Agreement, the defendants specifically agreed not to collect the Tax from the Exempt Travelers.[9]

---

[8] Specifically, the contract [translated into English] states it is an agreement among the airlines, CANAERO [defined above], and Mexico's Department of the Interior.  *See* CANAERO Agreement, Exhibit 1, at 1 [Preamble].

[9] The PROCEDURES provide:  "The fee for non-immigrants 'DNI,'  shall not be charged in any of the following cases:

- (A) Mexican citizens.
- (B) Non-Mexican passengers, while in connection or transit, traveling abroad with a stay of less than 24 hours at the connection or transit site inside the national territory.
- (C) Deported and/or rejected travelers.
- (D) Minors up to two years of age (infants).
- (E) Service crew.
- (E) [sic]Foreigners with resident status in Mexico.
- (F) Aeronautic Technical Personnel in Service, Protected by Migratory Form FM3."

*Id.* at 1.

59.     The CANAERO Agreement provides a "Procedure for the Collection and Payment of the Non-Immigrant Fees to the National Institute of Migration" (the "PROCEDURES").[10] Under the CANAERO Agreement, defendants agreed to remit the Tax to the Mexican government that the airlines properly collected from non-Exempt Travelers (*i.e.,* passengers actually subject to the Tax) using manifests and a designated form the defendants would complete for each flight showing the number of passengers per flight to whom the Tax applied.[11]

60.     Under the CANAERO Agreement, the defendants agreed to implement mechanisms to distinguish the cases in which the Tax does not apply; *e.g.,* in the instance of Mexican citizens and other Exempt Travelers who acquired airfare tickets for travel into Mexico.[12] This requirement exists to ensure assessment of the Tax solely against those travelers to Mexico whose travel is taxable.[13]   In appropriate cases, for example when the Tax is inadvertently or inappropriately assessed by a CANAERO affiliated company (such as each of the defendants) against an Exempt Traveler (such as the plaintiffs and the class they represent), the airlines agreed to ensure that a refund was provided.[14]

**E.  SCIENTER**

61.     In the months leading to execution of the Agreement and afterward, Mr. Alcocer and the individual persons representing the defendant airlines repeatedly discussed the airlines' actual understanding that the Agreement does not permit them to charge Exempt Travelers the Tax.   These discussions were held during regularly scheduled monthly meetings and plenary sessions of the airline representatives at CANAERO, and attended by representatives of each

---

[10] *See* PROCEDURES [translated to English], Exhibit 2.
[11] *See* CANAERO Agreement *a*t pgs. 5-6 (section (D)).
[12] *See* CANAERO Agreement, Exhibit 1, at page 5 (section (C)).
[13] *Id.*
[14] *Id.*

defendant airline, once they joined CANAERO. In addition, Mr. Alcocer had individual, private conversations with each of the representative members about these subjects, as he began to suspect that each airline had not implemented the procedures it had agreed to implement, including that each airline was not distinguishing between Exempt Travelers and non-Exempt Travelers.

62.     During these discussions with Mr. Alcocer, and to the extent they did not already know through their own meetings, each member defendant airline confirmed what each other was doing, *i.e.*, Mr. Alcocer confirmed to each airline that the others were acting consistent with their joint plan to wrongfully charge the Tax to Exempt Travelers, and withhold that illegal plan from the Mexican government and Exempt Travelers.

63.     Mr. Alcocer documented these understandings by making or causing to be made minutes of each meeting. These minutes were distributed to each representative of the airlines on the committee, so that each airline, through its committee representative, had a written record of these subjects. From time to time Mr. Alcocer attached documents discussed at the meetings in emails to each representative airline. There is therefore a written record of each defendants' understandings of the terms of the CANAERO Agreement, and the discussions with Mr. Alcocer confirming performance in accordance with the common agreement to violate the terms of the CANAERO Agreement.  There is no doubt each defendant airline was aware of their collective unlawful actions.

### F.   DEFENDANTS ACTED IN CONCERT TO CONCEAL AND MISREPRESENT

64.     Since signing the CANAERO Agreement, CANAERO and the defendant airlines have actively concealed the existence and specific terms of the CANAERO Agreement from the public, including the plaintiffs and the class they represent, and from other courts for many years.

65.     The defendant airlines agreed the subject of their Tax collection should be treated confidentially among them and not be shared with the public.  The existence of the CANAERO Agreement, once it was executed, was not publicly announced by the defendants or otherwise commonly published.  Commonly and consistently, the defendants expressed to Mr. Alcocer that they wanted the Agreement to remain undisclosed and secret. After many years of working with these defendants, Mr. Alcocer concluded defendants' desire for secrecy was driven by their desire that Exempt Travelers not realize they are, in fact, not subject to the Tax, and that they not try to seek a refund.

66.     However, the defendants took this element of their scheme to defraud and artificially raise airfare ticket prices two steps further:  the defendants jointly and actively concealed the details of their scheme, and made misrepresentations and omissions to various individuals, entities, and judicial bodies to further the secrecy element of their scheme, and to keep their ability to improperly collect the Tax from Exempt Travelers in the first place.  The defendants actively cooperated to conceal from Exempt Travelers, the INM, Mexico, their own CANAERO representative, and courts in the United States the fact they were improperly collecting the Tax from Exempt Travelers without authority and keeping the funds for themselves.

67.     As such, the plaintiffs and the class they represent not only could not have readily discovered the cause of the damages sought herein, but could not have reasonably discovered the fact that they were damaged by being charged for a tax they did not owe.

68.     The actions, described below, were jointly undertaken, and required coordinated effort to conceal the nature and extent of the practice.

i. **Concealed from Exempt Travelers**

69.     None of the defendants have ever disclosed the terms of the CANAERO Agreement publicly, or otherwise expressly notified Exempt Travelers of their right not to have the Tax collected from them, or to be refunded the amount of the Tax if collected in error.  To the contrary, implicitly and in many instances as a matter of actual statements, each of the defendants represent to Exempt Travelers that the defendants are required to collect the Tax from each passenger, including citizens of Mexico.

70.     Nowhere on their websites, or on passenger tickets or invoices, do the defendants disclose the existence of the CANAERO Agreement, or otherwise affirmatively notify Mexican citizens and other Exempt Travelers that they are exempt from the Tax and that no such tax is owed.  Rather, defendants have in the past, and continue to represent expressly and impliedly to all passengers, including the Exempt Travelers, that defendants are required to collect the Tax from plaintiffs and the putative class members travelling to Mexico.

71.     Each of the defendant airlines has illusory refund policies, some of which are available only through a personal visit to an airport facility, others through endless automated telephone menus. The procedures that an Exempt Traveler must follow to obtain a refund of her $20-$30 overcharge are buried on the airlines' websites, if available at all.  In all practical aspects, the procedures are illusory and designed to allow each airline to retain and keep all of the illegally-collected Tax funds.

ii. **Overt Misrepresentations or Omissions to the INM and Mexico**

72.     On many occasions since at least as early as 2009, Mr. Alcocer met with representatives of the INM, including Elizabeth Hernandez Saldivar ("Ms. Hernandez"), and the airlines regarding the improper collection and retention of the Tax from Exempt Travelers.  Ms.

Hernandez joined the INM in 2009 and shortly thereafter began raising the issue with the defendants.

73.     During these meetings, and including specifically a meeting in January 2013, the defendant airlines' representative members were (1) directly confronted by Ms. Hernandez with the allegation that each may be collecting the Tax from Exempt Travelers, and (2) asked to provide the INM an explanation why, and (3) asked what each airline was doing with any illegally collected tax funds.  The defendants refused to provide an explanation.

74.     On several occasions prior to the January 2013 meeting, Ms. Hernandez individually attempted to learn the airlines' positions on wrongfully collecting the Tax from Exempt Travelers.  A representative of Mesa Airways (transports for United Airlines), Raul Crisogono Montes Elizondo, admitted to Ms. Hernandez that Mesa and each of the other defendant airlines do collect the tax from every passenger, including Exempt Travelers.

75.     Maria Guadalupe Cecilia Romero Castillo ("Ms. Romero") is a former Chairman of the Committee on Foreign Affairs for Latin America and the Caribbean. On December 7, 2006, she was appointed Commissioner of the INM, where she remained in office until September 14, 2010.

76.     A number of times between 2007 and 2010, when she was Commissioner of the INM, Ms. Romero convened and attended a number of private, that is non-official and not officially documented, closed door meetings with CANAERO and the defendant airlines' representatives at CANAERO. The meetings were specifically held to confront the defendants regarding illegal collection of the Tax from Exempt Travelers.

77.     As head of the INM, Ms. Romero repeatedly demanded that the defendant airlines explain why they were collecting the Tax from Exempt Travelers, especially since the CANAERO

Agreement gave the airlines no right to do so. Ms. Romero spoke about the practice in the presence of each of the airline representatives from 2007 - 2010.

78.    Unlike their refusal to respond to Ms. Hernandez (except for the admission by defendant Mesa), the defendant airline representatives, jointly, acknowledged to Ms. Romero the collection of the Tax from Exempt Travelers, *and jointly represented that each airline would comply with the CANAERO Agreement and stop collecting the Tax from Exempt Travelers.* Notwithstanding those representations, the defendant airlines simply continued to collect the Tax from all Exempt Travelers after Ms. Romero left her position, and did not change their practice.

### iii.    Concealed from the INM and Mexico with Flight Manifest Reporting Procedure

79.    The CANAERO Agreement expressly obligates the defendant airlines to develop procedures to report to Mexico the passengers flown from the United States to Mexico.  One document used to verify proper collection and payment of the Tax by the defendants is the manifest of each of the airlines' flights into Mexico. The flight manifest is also used by the Mexican Civil Aeronautics Board to document the flight, and indeed flight manifests are commonly used by the FAA and other national and international aeronautic agencies, as well as law enforcement agencies for various purposes. For these reasons, it has been a requirement both within the United States and in Mexico that the airlines have an effective information collection system that enables each to completely and accurately provide data concerning each passenger on each manifest, including but not limited to information concerning the number of passengers (such as Mexican citizens) that the defendant airlines are not supposed to charge the Tax.

80.    Under both the INM authority and as part of the CANAERO Agreement, the airlines were required to submit to the INM confirmation of the remittance of payments by the airlines to the Public Treasury of Mexico for the Tax collected from each non-Exempt Traveler.

One of the requirements for such reporting was that each manifest submitted to the INM by each airline operating under the Agreement must include the flight number, the total number of passengers on the flight, and the total number of passengers subject to the Tax on each flight.

81.     The airlines have provided manifests to the INM since 1999. The form that was uniformly used by the defendant airlines contains space for the airlines to list certain items of information for each flight, such as the number of passengers actually flown, flight number, the departure city and arrival city, and the total number of passengers on the flight. Each manifest form submitted to the INM also provides an additional space to list the number of passengers who are subject to the Tax for each flight. Examples of such forms from American and Delta are attached as Exhibit 3.

82.     Each manifest submitted to the INM by the defendant airlines contains a misrepresentation.  Each lists the total number of passengers on the flight (for example one manifest attached as Exhibit 3 lists 148 passengers) and a different number of passengers the defendant considered non-exempt (on this manifest listing 88 passengers subject to the Tax). But, in fact, for the flight reflected on Exhibit 3, the airline considered all 148 passengers non-exempt and collected the Tax from all 148 passengers.  This occurred for all other flights listed in this Complaint as well (i.e., the defendants actually considered all passengers non-exempt and collected the Tax from all passengers, including Exempt Travelers, but kept the money they collected as the Tax from Exempt Travelers).

83.     The manifests also indicate that each defendant airline actually knew on a flight-by-flight basis the number of passengers who were in fact subject to the Tax and how many were exempt.  The manifests contain spaces for distinguishing between the number of Mexican nationals and infants and the remaining passengers.  This is important to defendants because it allows them

to calculate how much money from each flight that they collect as a Tax (but which is not a legal tax) they can keep for themselves, since it is not owed to Mexico, but is owned exclusively by unsuspecting passengers who have no idea they were cheated out of $20-$30.

84.     Each airline, including each defendant airline, from the earlier of the time that the CANAERO Agreement was executed, or when a defendant airline began flying routes into Mexico, used an internal reporting system that allowed each airline to determine whether the passengers are Mexican citizens, or have a different condition which exempts them from paying the Tax. The systems used by each airline are common, and include common web-based forms that require passengers to provide their passport information, common ticket agent passport information procedures, and common check-in procedures that necessitate the presentation of a passport before boarding. Indeed, for flights originating from the United States it is a requirement for each airline imposed by the FAA, U.S. Department of Immigration, and/or the Department of Homeland Security to obtain each passenger's passport number and nationality before the passenger is allowed to board a flight. Thus, at all relevant times, each defendant knew or should have known which passengers were Exempt Travelers. For many flights originating from the Southwest of the United States, a third or a half of each flight would typically be composed of such Exempt Travelers.  This scheme was, and remains, especially lucrative to the defendants for these flights.

85.     Each defendant airline actually knows and calculates for each flight how much money it properly collected from non-exempt passengers and therefore needs to remit to the Mexican government, and how much improperly collected Tax funds it will keep for itself.  This information is known to each defendant airline as early as at the time each flight is booked, and no later than shortly before the flight departs.

86.     Each defendant airline knows, and has known for each and every relevant flight it has flown, the precise number of passengers from whom it has collected the Tax. According to the thousands of manifests submitted by the defendant airlines to the INM over the years, *the defendants have represented to the INM that they have not collected the Tax from Exempt Travelers.*

### iv.     Concealed from the INM and Mexico with Payment Method

87.     Each defendant airline, for each year that it operated flights from the United States to Mexico, was responsible for and undertook to provide information to the Mexican government of the Tax moneys it collected from non-Exempt Travelers. The CANAERO Agreement required its members to inform the Mexican Federal Treasury of what Tax funds were collected through any financial institution authorized by the Mexican Tax Administration Service, an agency separate from the Department of Treasury. The purpose of the reporting was, among other things, to provide proof that the airlines were properly collecting the Tax only from non-Exempt Travelers.

88.     The defendant airlines reported the payments on a periodic (monthly and quarterly) basis from their United States operations to a bank account in Mexico City set up for the express purpose of collecting the funds. The payments served as a self-report for each airline for the moneys allegedly collected by each of them that were being passed through to the Mexican government, and, with the flight manifests, constituted the only accounting ever provided to the Mexican government of any Tax moneys collected by each airline from each flying passenger.

89.     The INM has access to the bank accounts since it is the agency that is responsible for receiving the moneys collected by each airline, and can review the periodic payments by

electronic means. The information that each airline provides to the INM is in a form chosen by the airline.

90.     Beginning in 1999 and continuing at least until late 2014, the defendants reported to the INM only gross, undifferentiated lump-sum payments of the Tax. The reported payments do not indicate, and have never indicated or identified, (1) how much Tax each airline had *actually* collected from passengers flying into Mexico for each reporting period, (2) how much Tax each airline had *actually* collected from Exempt Travelers flying into Mexico for each reporting period, (3) how much Tax each airline had *actually* collected from non-Exempt Travelers flying into Mexico for each period, and (4) what each airline did with the funds it actually collected from Exempt Travelers. The payments thus do not provide any means by which the INM could reconcile what was collected, what was remitted to the Mexican government, or what the airlines retained of the collected funds.

91.     This opaque form of reporting was and is deliberate. Each of the airlines could report to the INM the actual moneys it collects as part of the Tax collection, but has deliberately decided not to do so. Each airline treats the funds it collects from passengers on flights originating in the United States the same way. Each passenger's ticket lists, in addition to the price charged by each airline for the particular flight, all of the landing fees, airport taxes, and other taxes and fees added to the fare in addition to the Tax. Each airline has procedures in place to account to the appropriate taxing authority for all of these additional charges added to the fare, and therefore there is nothing exceptional or unusual about the Tax that prevents the airline defendants from accounting for the money.

92.     Each defendant airline only reports a gross, undifferentiated sum to the INM because the defendants collectively decided to deliberately conceal the fact that they are collecting

the Tax from every passenger, including Exempt Travelers who the airline knows are exempt, and from whom the defendant airlines simply keep the illegally collected Tax money.

### v.      Concealed from the CANAERO Representative

93.     Mr. Alcocer did not have any legal authority to force the defendant airlines to adhere to the terms of the Agreement. He did however, on multiple occasions since 1999, raise the subject with representatives of the defendant airlines in common conversations and meetings. At meetings attended by representatives of the defendants, Mr. Alcocer:

- stated that collecting the Tax from Exempt Travelers, as he understood the airlines were doing, was in violation of the CANAERO Agreement; and

- inquired why each airline was collecting the tax from Exempt Travelers without authority.

94.     No airline representative ever offered to Mr. Alcocer an explanation (but they did not deny they were in fact collecting the Tax from Exempt Travelers).

### vi.      Concealed from United States Courts

95.     As mentioned in the Introduction, above, various Exempt Traveler plaintiffs brought lawsuits against members of CANAERO, including two of the defendants in this action, related to the improper collection of the Tax.  The theories of liability in those cases were based upon state law contract arising from the contractual relationship between the plaintiff air travelers and the airline defendants vis-à-vis their air fare tickets and the airline defendants' contracts of carriage.  Representative examples of such suits include, *Sanchez v. Aerovias de Mexico, S.A. De C.V.*, 590 F.3d 1027 (9th Cir. 2010) and *McMullen v. Delta Airlines, Inc.*, 361 Fed.Appx. 757 (9th Cir. 2010).  In each case, the courts determined that the dispute was subject to the Airline Deregulation Act of 1978, and held that the plaintiffs could not make the requisite showing that their causes of action were exempted from the ADA due, in part, to the fact that the airlines had

undertaken no self-imposed obligation *not to collect* the Tax from all passengers to Mexico, regardless of whether they were exempt from the Tax.

96.     To plaintiffs' knowledge, the defendants in those cases, all members of CANAERO and signatories to the Agreement, while acknowledging the existence of the Tax, never disclosed in any of these prior lawsuits the existence of the CANAERO Agreement or that the airlines had willingly undertaken the obligation, through the express terms of the CANAERO Agreement, to refrain from collecting the Tax from Exempt Travelers.  Instead, the defendants in those actions remained silent.

97.     For example, in *Sanchez*, the plaintiff, who held dual Mexican-United States citizenship and thus was exempt from the Tax, sued AeroMexico (also a defendant in this action) in California state court for breach of contract, among other claims (but not federal claims, as are asserted here), when AeroMexico added the tax to the price of her airfare ticket from the United States to Mexico.[15]  AeroMexico moved to dismiss the suit under the Airline Deregulation Act of 1978, 49 U.S.C. § 41713, *et seq*., claiming the ADA preempted the plaintiff's claims:

> [B]ecause they relate to the airline's "price[s], route[s], or service[s]," 49 U.S.C. § 41713(b)(1), and are not excepted because Aeromexico had no contractual obligation to advise passengers about the tax or their right to a refund.[16]

98.     The Ninth Circuit upheld the District Court's grant of summary judgment on these grounds.[17] The ADA generally preempts state law causes of action by barring any state-enacted "law, regulation, or other provision having the force and effect of law related to a price, route, or

---

[15] *Sanchez*, 590 F.3d at 1028.

[16] *See id*.

[17] *See id.* at 1028 and 1031.

service of an air carrier….” 49 U.S.C. § 41713(b)(1) unless the airline breaches its own ***self-imposed undertakings***.

99.     AeroMexico, however, never disclosed to the federal district or appellate courts (or, apparently, to the plaintiff in that case) that AeroMexico and its competitors were in fact signatories to a *private contract* (a “self-imposed undertaking”) through CANAERO in which the airlines had agreed to implement measures to ensure that Exempt Travelers (like Sanchez in that case) were not charged (or alternatively were refunded) the Tax.[18]

100.     AeroMexico’s Vice President Comptroller, Cesar Laguna, filed a declaration in *Sanchez* in which he represented to the court, while discussing the Tax, that CANAERO had on behalf of the defendants:

> [A]greed with the government of Mexico on procedures whereby Aeromexico and the other airlines it represents would collect the UK Fee [i.e., the Mexico Tourism Tax] from passengers traveling on routes from abroad into Mexico, then remit the UK Fees to the government of Mexico.[19]

This declaration creates the impression that Aeromexico was simply complying with governmental obligations imposed by Mexico. But the declaration failed to disclose the actual obligations AeroMexico voluntarily assumed under the CANAERO Agreement.

101.     The AeroMexico comptroller failed to disclose or identify in his declaration the actual terms of the written CANAERO Agreement.  Nor did he disclose that AeroMexico and its competitors (including the airline defendants in this case) were direct parties to, and obligees under, a written contract they willingly had subjected themselves to (*i.e.,* the CANAERO

---

[18] *See generally* defendants’ pleadings in the District Court (C.D. Cal. Cause No. 2:07-cv-07280-R-RC) and at the Ninth Circuit (Case No. 08-55588).
[19] *See* the Declaration of Cesar Laguna in Support of Motion to Dismiss or, in the Alternative, Motion for Summary Judgment of Aerovias de Mexico, S.A. De C.V., filed in the underlying District Court Case [C.D. Cal. Cause No. 2:07-cv-07280-R-RC], [Dkt. No. 35] at 2 (Page ID# 147).

Agreement).[20]  Nor did he advise the court that AeroMexico and the other airlines were required by the CANAERO Agreement to *not* collect the Tax from the Exempt Travelers.  He failed to disclose the fact that AeroMexico and the other defendants are required to reimburse Exempt Travelers when the Tax is improperly collected. Even today, none of the defendants here disclose on their websites or in other advertising the existence of the CANAERO Agreement, or the fact that certain specific passengers (*i.e.,* the plaintiffs and the class they represent) are specifically exempt from the Tax, and should be reimbursed if the Tax is improperly collected from them.

102.    Misled by these material omissions, the Ninth Circuit found no evidence that AeroMexico had any contractual obligation "*not to collect* [the Tax] from those who are exempt, *or to refund it to exempt passengers from whom it was nevertheless collected.*"

103.    In a subsequent suit, the plaintiff in *McMullen v. Delta Airlines, Inc.*, sued Delta on a breach of contract theory (among other causes) relying on two provisions of Delta's International Contract of Carriage.  Delta similarly failed to disclose the existence of the CANAERO Agreement in *McMullen*, and the Ninth Circuit dismissed that case, too, for lack of evidence of "any contractual language that obligates Delta *not to collect* the Mexican tax from all passengers to Mexico, regardless of whether they are exempt from the tax."[21]

### G.  DEFENDANTS JOINTLY OPPOSE LOSS OF TAX CONCESSION

104.    In 2010 the INM proposed to CANAERO and representatives of the airlines to discontinue the procedure that allowed the defendants to collect *any* tourism tax, and to implement a new procedure that would prevent the unlawful collection of the Tax from Exempt Travelers. The defendant airlines directed their CANAERO representatives to *oppose* this proposal that

---

[20] *See generally id.* [Dkt. No. 35].
[21] *McMullen*, *supra*, 361 Fed.Appx. at 758 (9th Cir. 2010) (emphasis added).

would have put an end to the unlawful assessment of the Tax on Exempt Travelers by the defendant airlines.

## H.  PRICE-FIXING ADMISSION

105.     Mr. Laguna's declaration admits that there is an agreement or understanding among the defendants that each will charge the Mexico Tourism Tax to all passengers, including the Exempt Travelers, and thus artificially inflate the ticket price for Exempt Travelers.  He states:

> 8.  . . . I am informed and believe that . . . United Airlines, American Airlines, and other airlines which fly routes into Mexico all provide this service to their passengers.
>
> 9.  With respect to the collection of the UK Fee, it is not feasible for AeroMexico to implement procedures that are different from those of its competitors. . .  Any change in procedures that would inhibit the flow of AeroMexico's passengers routed to Mexico through the destination airports or cause its passengers to experience longer delays than passengers of other airlines would put AeroMexico at a competitive disadvantage with the other airlines operating on routes into Mexico.[22]

106.     As Mr. Laguna's admission starkly implies, it would not be easily feasible for only a few airlines to unlawfully charge the Tax to Exempt Travelers.  When most (if not all) of them do it, then none is placed at a "competitive disadvantage" with respect to the other defendant airlines.  The defendants haver therefore artificially fixed the ticket price for each Exempt Traveler by an additional approximate $20 - $30.

## V.     CLASS ACTION ALLEGATIONS

107.     Plaintiffs bring this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2) and 23(b)(3).

108.     Plaintiffs bring this action individually and for a class tentatively defined as:

---

[22] *See* the Declaration of Cesar Laguna at 3.

> All Mexican nationals, guardians of children under the age of two at the time of their travel, and foreigners with resident status in Mexico, who purchased airfare for flights from the United States to Mexico between June 30, 1999 and the present, from one or more of the defendants, and whose purchase prices included a Mexico Tourism Tax and whose tax payment was not refunded.

109.    Plaintiffs' claims are typical of the claims of the class in that, during the relevant period, defendants sold them tickets for air travel from the United States to Mexico and included the Tax in the purchase price despite the fact that purchasers were Exempt Travelers, who did not owe the Tax.  The method to determine damages incurred by each plaintiff and each class member are also identical – *i.e.*, the amount of money wrongfully collected by each defendant from each plaintiff and class member.

110.    Plaintiffs will fairly and adequately represent the interests of the class because their claims are typical of those of the class and their interests are fully aligned with those of the class. Plaintiffs have retained attorneys that are experienced and skilled in complex class action litigation, including in class action RICO litigation and other complex commercial litigation.

111.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

112.    The defendants have acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. FED. R. CIV. P. 23(b)(2).  If the plaintiffs prove that the defendants systematically violated the RICO Act and/or the Sherman Act as alleged in this complaint or otherwise, the Court should enjoin the defendants from continuing such behavior in the future.

113.   This case presents questions of law and/or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy and for protecting the rights of each plaintiff and Class member. FED. R. CIV. P. 23(b)(3).

114.   The questions of law and/or fact common to the class, include but are not limited to the following:

a.   Whether the defendants agreed to be bound by the terms of the CANAERO Agreement;

b.   Whether the defendants engaged in acts of mail and/or wire fraud in furtherance of their scheme to collect and keep monies from plaintiffs that was never owed;

c.   Whether the defendants engaged in acts of mail and/or wire fraud when they collected the Tax from the class members;

d.   Whether the defendants contracted, combined or conspired with their one another to fix, raise, maintain, and/or stabilize the prices for passenger air transportation by uniformly and wrongly assessing the Tax against the class members;

e.   Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for passenger air transportation;

f.   Whether the defendants violated the Racketeer Influenced Corrupt Organizations Act (18. U.S.C. § 1961-68);

g.   Whether the defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1);

h.   Whether the defendants were unjustly enriched by unlawfully collecting the Tax from the class members, and keeping those ill-gained funds for themselves;

i.   Whether defendants fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

j.   Whether the defendants caused injury to the business or property of class members by improperly charging them with the Tax from which defendants knew or should have known the class members were exempt; and

    k.      Whether plaintiffs and members of the class are entitled to injunctive relief to prevent the continuation or furtherance of the violations of and Section 1 of the Sherman Act.

115.    These and other questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members. No element necessary to establish RICO or Sherman Act liability requires individualized proof.

116.    Plaintiffs' claims are typical of the claims of the class.

117.    A class action under FED. R. CIV. P. 23(b)(3) is superior because:

    a.      Individual litigation of claims by plaintiffs and class members is impracticable and would prove unduly burdensome to the resources of the parties and to the Court. Individual litigation would be economically infeasible to redress claims for the $20-$30 wrongfully collected Tax funds;

    b.      No other known pending litigation exists over these issues;

    c.      It is manifestly desirable to concentrate the litigation of the class' claims in Maryland and this district;

    d.      This case as a class action will present no management difficulties for the Court.

## VI.    COUNTS

### A.    <u>COUNT ONE:</u>  RACKETEER INFLUENCED CORRUPT ORGANIZATION ACT [18 U.S.C. §§ 1961-68]

#### i.    THE COMMON ELEMENTS OF THE RICO ACT, 18 U.S.C. §§ 1961-68

118.    RICO prohibits the following conduct:

It shall be unlawful for **[1]** any person **[2]** employed by or associated with **[3]** any enterprise **[4]** engaged in, or the activities of which affect, interstate or foreign commerce, **[5]** to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs **[6]** through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961-68 (numbering added to text of statute)

The facts as alleged herein establish that each of the requirements of RICO liability are met.

### ii.     ALL DEFENDANTS ARE RICO "PERSONS"

119.    Each defendant named herein is a "person" for purposes of the RICO Act.  A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  A RICO person can be either an individual or a corporate entity. As corporations, all defendants are RICO persons.

### iii.     THE RICO ENTERPRISE

120.    RICO defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[23]  All defendants have agreed among themselves, expressly or tacitly, to act in unison to collect monies from plaintiffs and the class they represent under the aegis of the Tax that was never actually owed. All defendants together with non-party CANAERO have acted as an "association-in-fact" for a common purpose, have and maintained relationships between and among each other (and nonparties), and the association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose – to improperly profit from knowingly and wrongfully collecting the Tax from Exempt Travelers.

121.    Each defendant has an existence that can be defined apart from the commission of the predicate acts constituting the pattern of racketeering activity.  That is, each defendant has a separate, legitimate existence as an operating business.

122.    A defendant can be both a RICO "person" and part of another RICO "enterprise." Corporations are included in the Act's definition of a "person." 18 U.S.C. § 1961(3).  All defendants systematically committed the RICO violations alleged here with respect to the class, and are thus also RICO "persons" separate from the RICO "enterprise" at issue here.

---

[23] 18 U.S.C. § 1961(4).

123.    There is also an identifiable framework within the "enterprise" here capable of consensual decision making that is separate from and would still exist even apart from the predicate acts alleged here.  The defendants established a central organization, CANAERO, to facilitate their planning, and then appointed representatives and leaders for the purposes of making group decisions, and for corresponding with Mexico, CANAERO, and each other.

124.    Representatives from each of the defendants, as well as their jointly appointed CANAERO representative, routinely met with each other and representatives of the INM, including former Commissioner of the INM, Maria Guadalupe Cecilia Romero Castillo, and Director of the INM, Elizabeth Hernandez Salvidar, in Mexico at meetings extending from 1999 through recent years.  At these meetings, the defendant airlines, in the presence of these INM officials, expressly agreed they would cooperate with each other so they could continue to keep the unlawfully collected Tax funds for themselves.  In particular, the defendants agreed they would:  1) not establish a reasonable means to avoid charging Exempt Travelers the Tax; 2) not establish a reasonable means to refund the Tax to Exempt Travelers, and 3) charge Exempt Travelers the Tax, even though the CANAERO agreement prohibited them from doing so.  The defendants also expressly agreed they would oppose the cessation of their right to charge the Tax to any individual (Exempt Travelers and non-Exempt Travelers), and they conveyed this agreement to these INM officials through their CANAERO representative.

125.    The express agreements among the defendants in furtherance of their scheme to wrongfully collect the Tax include at least the following:

    a.    The defendants each signed the CANAERO agreement that invested them with the authority to charge the Tax;

    b.    The defendants agreed to cooperate with each other so they could continue to keep the unlawfully collected Tax funds for themselves;

c.     The defendants agreed they would not establish a reasonable means to avoid charging Exempt Travelers the Tax;

d.     The defendants agreed they would not establish a reasonable means to refund the Tax to Exempt Travelers;

e.     The defendants agreed they would charge Exempt Travelers the Tax, even though the CANAERO agreement prohibited them from doing so;

f.     The defendants jointly agreed to oppose Mexico's effort to strip defendants of the authority to charge the Tax;

g.     The defendants jointly agreed the Tax procedure would apply equally to each airline;

h.     The defendants jointly agreed the subject of their Tax collection should be treated confidentially among them, and not be shared with the public;

i.     The defendants jointly agreed to conceal their Tax collection from Exempt Travelers from the INM representative;

j.     The defendants jointly misrepresented to the INM representative that they would cease collecting the Tax from Exempt Travelers, in order to convince the INM to continue their authority to collect the Tax;

126.    Each defendant also engaged in identical conduct that demonstrates an agreement to wrongfully collect the Tax. This conduct cannot be explained by mere competition alone, as the conduct itself is actually anti-competitive, and without an agreement among the defendants to each engage in the conduct, would place the individual defendants at a competitive disadvantage. This conduct includes at least the following:

a.     Each defendant utilized a ticket sales system that would not avoid collecting the Tax from Exempt Travelers at the time of ticket sale;

b.     Each defendant indiscriminately collects the Tax from all passengers from the United Sates to Mexico;

c.     Each defendant brazenly collects the Tax from passengers it knows are not obligated to pay the Tax (*i.e.*, Exempt Travelers);

d.     Each defendant falsely represents to Exempt Travelers that they are required to pay the Tax;

e.     No defendant informs Exempt Travelers they are exempt from the Tax;

f.    No defendant informs Exempt Travelers they are entitled to a refund of the improperly collected Tax;

g.    No defendant has a reasonable system in place to refund the Tax;

h.    Each defendant submits flight manifests to Mexico that, in identical fashion, misrepresents the number of passengers it considered non-exempt from the Tax;

i.    Each defendant conceals from Mexico the full amount of Tax funds it collects with the identical tax remittance method;

j.    Each defendant never pays any of the unlawfully collected Tax funds to Mexico.

127.   These identical and unlawful actions by each of the defendants demonstrates their agreement to each engage in this scheme.  From the perspective of healthy and fair competition, it would benefit each individual airline to try to undercut the competition by not collecting the Tax when collection is not required.  Defendants' actions cannot be explained away with competitive reasoning.   These actions are most plausibly explained by a cooperative effort to create an unlawful, cost-free profit center for this group of airlines by collecting a tax from unsuspecting passengers, without any authority to do so.

### iv.    ALL DEFENDANTS ARE "ASSOCIATED WITH" THE RICO "ENTERPRISE"

128.   Under Section 1962(c), a defendant must be "employed by or associated with" the RICO enterprise.   All defendants are at least "associated with" the enterprise through their individual and collective actions, their mutual affiliation with CANAERO, their mutual involvement in outwardly agreeing to comply with the terms of the CANAERO Agreement while internally agreeing to uniformly violate that agreement, to collectively reject the proposal to lose their right to collect the Tax from any traveler, to keep the existence of the CANAERO Agreement

undisclosed to the public, and/or in otherwise committing the systematic and consistent misrepresentations and predicate act RICO violations alleged here.

### v.     ALL RICO "PERSONS" ARE DISTINCT FROM THE RICO "ENTERPRISE"

129.    The corporations described in this complaint are distinct from each other. The corporate defendants are distinct from their collective RICO enterprise because they are functionally separate, perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity. Each of the corporations has a distinct market share, has separate advertising, and is thus responsible for different activities in the scheme.

### vi.     THE DEFENDANTS ENGAGE IN ACTIVITIES THAT AFFECT INTERSTATE AND FOREIGN COMMERCE

130.    Each of the defendants engaged in, and/or each's activities affect, interstate or foreign commerce by committing the RICO violations alleged here with respect to Exempt Travelers flying from the United States to Mexico.

### vii.     THE DEFENDANTS PARTICIPATED IN THE CONDUCT OF THE ENTERPRISE'S AFFAIRS

131.    Each of the defendants conducted, or participated directly and indirectly, in the conduct of the RICO enterprise's affairs.  The defendants agreed that each would violate the CANAERO Agreement for the benefit of all, that each would execute the scheme to unlawfully collect and retain illegal tax funds using the same or similar procedures, and agreed to collectively oppose any loss of their right to collect the Tax.

132.    The behavior described in this Complaint also required coordinated activity because if several airlines did not collect the Tax from Exempt Travelers, or tried to pay the illegally collected Tax funds to Mexico, the others' illegal collection of the Tax would be obvious and exposed.  Each of the defendants knew for many years that each other was following the same

practice and that the INM and their own agent who negotiated the Agreement considered the practice illegal. The decisions not to provide any justification to the INM in spite of years of inquiries and accusations, and to conceal the existence of the Agreement not to collect the taxes from Exempt Travelers, demonstrate a coordinated course of conduct.

### viii.   A "PATTERN OF RACKETEERING ACTIVITY" OVER AN EXTENDED PERIOD WITH THREAT OF REPETITION

133.   RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961 (1) (D)). *See* 18 U.S.C. § 1961(5). A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition.  It can also be conduct over a closed period through a series of related predicates extending over a substantial period.  Both of these apply here.

134.   The defendants' pattern of racketeering activity is well established and has continued from 1999 (or thereafter about the dates that each defendant began operating flights to/from Mexico and/or agreed to the terms of the CANAERO Agreement) through the present and has no signs of stopping in the future.  Each instance of mail or wire fraud, as detailed more fully below, is a separate RICO predicate act.  Still today, each defendant continues to:

- use the mail or wires to advertise, sell, or deliver airfare tickets with unlawful and unauthorized tax charges *at least hundreds of times each week for many years* (as more fully described below;

- unlawfully and knowingly collect the Tax from Exempt Travelers;

- conceal from Exempt Travelers that they are exempted from the Tax;

- fail to advise Exempt Travelers that they should be reimbursed the Tax when improperly collected;

- fail to provide measures by which Exempt Travelers may be reimbursed the Tax when improperly collected; and

- retain the unlawfully collected Tax.

### ix.    USED AND CAUSED FRAUDULENT MAIL AND WIRE COMMUNICATIONS [18 U.S.C. § 1341 AND 18 U.S.C. § 1343]

135.    The defendants each used and caused to be used mail and wire means to both 1) send fraudulent communications, and 2) further their fraudulent scheme to unlawfully collect, and retain, the Tax from the class.  These uses of the mail and wires are an essential component of the scheme to defraud.  Mail and wire fraud are enumerated predicate acts that constitute RICO "racketeering activity" under Section 1961(1)(D).

136.    Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341. Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343.  Since 1999 (or about the dates that each defendant began operating flights to/from Mexico), the defendants have transmitted, caused to be transmitted or invited others to transmit to class members advertising, tickets, itinerary confirmations, receipts, invoices, and other material relevant to airfare tickets for travel from the United States to Mexico, by mail or private or commercial carriers (such as UPS).  Examples of specific fraudulent wire transmissions are the tickets sold to the class representatives, transmitted by wire:

| Date of Ticket Purchase | Date Refund should have been offered | Defendant Sending Ticket-Invoice | Traveler | Points of Travel | Flight # | Amount of Unlawful Tax Paid |
| --- | --- | --- | --- | --- | --- | --- |
| October 4, 2018 | October 15, 2018 | AeroMexico | Miguel Hilarion Jimenez | Houston and Mexico City | 471 | $28.00 |

| February 4, 2019 | February 17, 2019 | Interjet | Miguel Hilarion Jimenez | Houston and Mexico City | 3987 | $27.69 |
|---|---|---|---|---|---|---|
| August 31, 2016 | February 14, 2017 | United | Olivia Isabel Gonzales | Houston and Cancun | 1086 | $20.98 |
| May 25, 2018 | June 23, 2018 | Delta | Noel Moran Rojas | Baltimore and Mexico City | 5276 | $29.05 |
| September 21, 2016 | October 16, 2016 | Southwest | Mayra Luisa Castillo Casteneda | Chicago and Mexico City | 3086 | $20.11 |
| April 11, 2016 | May 1, 2016 | United | LuzMaria Armendaiz De Arroyo | Houston and Mexico City | 5521 | $22.07 |
| February 27, 2015 | March 1, 2015 | Viva Aerobus | Patricio Mercado | Houston and Monterrey | VIV1951 and VIV1950 | 342.12 Pesos |
| June 6, 2018 | June 20, 2016 | jetBlue | Alexandra Almanza | Washington D.C. and Mexico City | 1223 | $27.40 |
| January 11, 2019 | January 19, 2019 | American | Alexandra Almanza | Chicago and Mexico City | 328 | $27.69 |

137.   Each of the above listed transmissions were themselves fraudulent because:

a.   Each represented, either expressly or by implication, the Exempt Traveler owed the Tax;

b.   Each represented, either expressly or by implication, the defendant airline had the authority to charge the Tax to the Exempt Traveler;

c.   Each Exempt Traveler did not owe the Tax;

d.   None of the defendant airlines had the authority to charge the Tax to the Exempt Traveler;

e.   Each of the defendant airlines knew the Exempt Traveler did not owe the Tax;

f.   Each of the defendant airlines knew it did not have the authority to charge the Tax to the Exempt Traveler;

g.  Each Exempt Traveler paid the Tax in reliance on the defendant's representation it was owed;

h.  None of the defendants advised the Exempt Traveler she/he did not owe the Tax, or may not owe the Tax;

i.  None of the ticket-invoices advised Exempt Travelers of a right to a refund; and

j.  Each defendant airline benefitted from the misrepresentation by keeping the unlawfully collected Tax funds for itself.

138.  Because each ticket-invoice sent by mail or wire by the defendant airlines itself contained misrepresentations, each occurrence was a separate act of mail or wire fraud.  The examples of these transmissions listed in the above table are only a small fraction of the instances of mail or wire fraud committed by each defendant.  For at least the past fifteen years, each defendant has routinely used the internet and e-mail, reasonably believed to be at least tens of thousands of times, to transmit ticket-invoices to Exempt Travelers, and to collect unlawfully charged Tax funds from Exempt Travelers.

139.  Independent of whether or not each of the ticket-invoices themselves contained a misrepresentation, each of those transmissions were in furtherance of, and an essential element of, the scheme to defraud in that they operated to:

a.  act as a vehicle to conduct the primary function of the enterprise;

b.  act as a vehicle to convey information to Exempt Travelers that they owed the Tax;

c.  act as a vehicle to deliver the overcharged ticket to the Exempt Travelers;

d.  act as a vehicle to collect the unlawfully charged Tax for the airlines.

140.  Plaintiffs estimate that flights from the United States to Mexico are typically booked by Exempt Travelers anywhere from one-third to one-half of the airplane's capacity, occurring continuously over many years.  Each transmission of a ticket-invoice to an Exempt Traveler, and each instance of conducting a transaction to collect the unlawfully charged Tax from

an Exempt Traveler, was done so for the purpose of executing defendants' scheme or artifice to defraud in furtherance of the RICO enterprise.  In fact, these uses of the mails and wires were essential to the operation of the enterprises, and the scheme to defraud could not have been accomplished without these uses of the mails and wires.  As such, each of these tens of thousands of transmissions was a separate act of mail or wire fraud.

141.    Aside from the tens of thousands of ticket-invoice transactions used by defendants to operate their scheme of unlawfully collecting a Tax from Exempt Travelers, since 1999 or the date thereafter that each defendant began charging members of the class the Tax, the defendants have used the Internet to disseminate, publish, and/or direct to the public in general and class members in particular, material and information for the purpose of executing their scheme or artifice to defraud. The defendants have each maintained an Internet website, to be used in interstate commerce, for the purpose of advertising and marketing their travel services from the United States to Mexico, including writings, signs, signals, pictures, and sounds.    Without limitation, for example, each transmission or display of webpages, emails, text messages, receipts, itineraries, flight confirmations and the like, and/or any transmission of signals, pictures or information by such means is a separate act of wire fraud, in violation of 18 U.S.C. §1343.

## x.    INTENT AND SCIENTER

142.    Each defendant acted with requisite intent to establish, perpetuate and/or carry out the scheme to defraud. Each defendant acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the enterprise or otherwise so as to constitute requisite *scienter* to commit mail and wire fraud. That *scienter* is demonstrated by, among other things, at least the following:

- The defendants, together and individually, indicated to their own CANAERO representative they were illegally collecting the Tax from Exempt Travelers.

- Each defendants' active concealment of the facts of illegal collection from the INM.

- The January 4, 2008, Declaration of Aeromexico Vice President/Comptroller, Cesar Laguna, submitted in the *Sanchez* case and discussed earlier in this Complaint[24], reveals the defendants cooperated and colluded, through their common membership in CANAERO and with each other, directly and indirectly, to collect the Tax indiscriminately from Exempt Travelers and keep it for themselves.

- The defendants were parties to, or were aware of, lawsuits alleging that they were misrepresenting to passengers their obligation to pay the Tax, and were unlawfully collecting that tax.  None of these lawsuits were resolved in favor of any of the defendants on the merits, such that any defendant could reasonably believe the tax they were collecting from class members was lawful.

### xi.   DEFENDANTS' CONDUCT HAS PROXIMATELY CAUSED PLAINTIFFS' RICO INJURY TO BUSIINESS OR PROPERTY

143.   Defendants are liable because plaintiffs were injured in their business or property by reason of defendants' violation of 18 U.S.C. § 1962.  *See* 18 U.S.C. §1964(c).  A "violation" of RICO is committed if "individuals and entities," use the mails or interstate wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§ 1341, 1343, Sections 1961(1) (B), 1962. Sections 1964 (a), (c) and (d) authorize persons "injured" in their "business or property," "by reason of" RICO's "violation" to sue for appropriate redress, including equitable relief, treble damages and attorneys' fees.

144.   A plaintiff need not show that he or she relied on any allegedly fraudulent misrepresentations to state a claim under RICO.  Establishing a proximate cause of a RICO "scheme to defraud" requires only showing use of the mail or wire in furtherance of a scheme to

---

[24] *Sanchez v. Aerovias de Mexico, S.A. De C.V.*, C.D. Cal. Case No. 2:07-cv-07280-R-RC.

defraud and an injury proximately caused by that scheme.  Proximate cause exists where there is some direct "relation between the injury asserted and the injurious conduct alleged."[25] Considerations of foreseeability, directness, and logic are parts of RICO-related proximate cause.

145.    To the extent reliance is necessary to establish the proximate cause of plaintiffs' injuries, that reliance or proximate cause may be proven on a class-wide basis, without individualized proof.  No rational person would voluntarily pay $20 - $30 for a tourism tax she does not owe, only to have it retained by the private tax collector for his own profit, and not remitted to the "toured" country.  Reliance may therefore be inferred and presumed from the very nature of the transaction.

146.    In addition, defendants accomplished this lucrative scheme through third-party reliance on multiple misrepresentations.  Among them, defendants jointly:

    a.    misrepresented to the Mexican INM that they would not charge Exempt Travelers the Tax.  Without this misrepresentation, the defendants would never have gained the right to charge the Tax to any passengers from the United States to Mexico;

    b.    misrepresented to the Mexican INM that they would had the resources to, and would in fact, distinguish between non-exempt and charge Exempt Travelers to avoid charging the Tax to Exempt Travelers.  Without this misrepresentation, the defendants would never have gained the right to charge the Tax to any passengers from the United States to Mexico;

    c.    misrepresented to the Mexican INM that they would establish reasonable procedures to ensure they refunded Tax funds to improperly charged Exempt Travelers.  Without this misrepresentation, the defendants would never have gained the right to charge the Tax to any passengers from the United States to Mexico;

    d.    misrepresented to the Mexican INM that they would cease their practice of indiscriminately charging the Tax to Exempt Travelers, in exchange for their right to continue charging the Tax.  Without this misrepresentation, the defendants would not have retained the right to charge the Tax to any passengers from the United States to Mexico

---

[25] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462, 126 S.Ct. 1991, 1999 (2006).

147.    The plaintiffs and the class they represent each suffered the same injury—loss of money—that was directly foreseeable, indeed intended, by defendants and directly related to the scheme.  Each putative class member remitted to defendants a tax they did not owe. Here, the defendants, since 1999 (or about the dates that each defendant began operating flights to/from Mexico), have operated the same scheme, with the same general participants, to improperly collect the Tax from unsuspecting Exempt Travelers.

148.    The precise amount lost by the class has not yet been determined but is believed to be in the tens of millions of dollars, if not hundreds of millions of dollars, in the aggregate from 1999 through the present, and increasing on a daily basis.  The means of determining the loss is the same class-wide.  Upon information and belief, each defendant has tracked, maintained, and accounted for amounts of the Tax improperly collected for each year from 1999 (or about the dates that each defendant began operating flights to/from Mexico) through present (and likely for each and every flight, through the use of manifests and/or special forms the CANAERO Agreement required defendants to remit to the Mexican government showing the number of non-Exempt Travelers per flight to Mexico). Thus, the precise loss of every class member is easily capable of being ascertained in this litigation in the same manner, and the total business injury computed for the class.

### xii.    VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c)

149.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

150. Each of the defendants has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the plaintiffs and the class by their actions.

### xiii. VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(a)

151. Section 1962(a) makes it unlawful, "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate commerce."

152. Defendants have received income derived from the pattern of racketeering activity described herein and, on information and belief, have used such income in the "acquisition of an interest in," and/or in the "establishment or operation of" the enterprise at issue here by using portions of those ill-gotten gains to fund CANAERO, and/or to increase and/or sustain defendants' individual and collective market access and profits in the United States-to-Mexico air travel market.

153. The defendants thus have violated the RICO Act's Section 1962(a) and, jointly and severally, have caused plaintiffs and the class a business injury.

### xiv. VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(d)

154. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

155. The defendants have participated in a conspiracy to engage in the conduct referenced in Count One. As the declaration filed in the California federal court litigation by Aeromexico's Vice President/Comptroller reveals, each defendant knew all defendants were improperly charging class members with the Tax but explicitly and/or implicitly conspired and

colluded to not "rock the boat" by rectifying that situation or disclosing to class members the CANAERO Agreement and the fact of their exemption from the Tax and right not to have that tax collected from them, or their right to refunds.  This arose out of each defendant's fear of being put to a competitive disadvantage by the rest of the group continuing the improper practice and/or out of a desire to make additional revenue and/or save themselves and each other money by simply keeping quiet and letting the scheme continue.

156.    As stated above, each of the defendants has participated in the scheme and their participation is necessarily a combination of more than two individuals.  The defendants' creation, support or maintenance of the fraudulent scheme is illegal.   The defendants and others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the scheme detailed herein.

157.    Each defendant has violated Section 1962(c) and is liable, jointly and severally, for the business injury defendants caused to the plaintiffs and the class.

**B.**  **COUNT TWO:**  **ANTI-TRUST – PRICE FIXING [SHERMAN ACT, 15 U.S.C. § 1]**

158.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

159.    Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of passenger air transportation, by uniformly and unlawfully including a charge for the Tax to Exempt Travelers on flights between the United States and Mexico, in violation of the Sherman Act, 15 U.S.C. § 1.  This is a *per se* violation of Section 1 of the Sherman Act.

160.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive

levels, the prices of passenger air transportation, by uniformly and unlawfully including a charge for the Tax to Exempt Travelers on flights between the United States and Mexico. Their illegal activities involved import trade or import commerce with foreign nations.

161.    In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize passenger air transportation by the price of the unlawfully charged Tax. These activities included the following:

a.    Agreeing to undertake, and then uniformly violate, the obligations to maintain a system to identify Exempt Travelers, avoid charging Exempt Travelers the Tax, and maintain and operate a meaningful system to refund improperly charged funds to Exempt Travelers, all in exchange for gaining the right to charge the Tax at the time of ticketing-invoicing;

b.    Agreeing to uniformly and unlawfully charge Exempt Travelers the Tax;

c.    Agreeing to misrepresent to Exempt Travelers they have the authority to collect the Tax from Exempt Travelers;

d.    Agreeing to misrepresent to Exempt Travelers they are collecting a Tax for the benefit of Mexico tourism;

e.    Agreeing to uniformly fail to advise Exempt Travelers they do not owe the Tax;

f.    Agreeing to not maintain a meaningful system to refund unlawfully charged Tax funds;

g.    Agreeing to keep secret from the public their policy of unlawfully charged Exempt Travelers the Tax;

h.    Agreeing to uniformly and collectively resist the suspension of their right to collect the Tax;

i.    Agreeing to keep the unlawfully collected Tax funds for themselves; and

j.    Agreeing to not inform Mexico of the amount of unlawfully collected Tax funds they kept for themselves.

162.    The illegal contract, combination or conspiracy alleged herein had the following effects, among others:

a.      The prices charged by defendants to, and paid by plaintiffs and members of the Class for passenger air transportation from the United States to Mexico were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels

b.      Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of passenger air transportation from the United States to Mexico;

c.      Plaintiffs and members of the Class have been required to pay more for passenger air transportation than they would have paid in a competitive marketplace absent defendants' price-fixing conspiracy

d.      Competition in the sale of passenger air transportation has been restrained, suppressed or eliminated.

163.     Defendants' conduct as alleged herein constitutes or involves import trade or import commerce. Additionally, this conduct both had a direct, substantial, and reasonably foreseeable effect on American domestic, import and export commerce, and had an effect of a kind that antitrust law considers harmful. Higher United States prices brought about by defendants' conspiracy proximately caused injury to those who purchased tickets for air passenger travel from the United States to Mexico.

164.     As a direct and proximate result of defendants' conduct, the plaintiffs and members of the class have been injured and damaged in their business and property in an amount to be determined according to evidence this action will produce.

## C.  <u>COUNT THREE:</u>  FRAUD AND FRAUDULENT OMISSION OR CONCEALMENT

165.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

166.     Plaintiffs and the class allege in the alternative that they have been damaged by defendants' fraudulent acts, and their fraudulent omissions or concealment.

167.    By including a charge for a Mexican Tourism Tax to each Exempt Traveler during the transaction of selling an air travel ticket, each defendant represented that:

      a.    it had the authority to charge the Tax to the Exempt Traveler;

      b.    the Exempt Traveler owed the Tax; and

      c.    the Tax funds would be paid to the Mexican government.

168.    Because each defendant airline made the above representations to the plaintiffs and the Class, each defendant had a duty to disclose to each Exempt Traveler that:

      a.    it was contractually prohibited from charging the Tax to the Exempt Traveler;

      b.    the Exempt Traveler had a right to a prompt refund of the Tax; and

      c.    it was keeping the Tax funds for itself, and not remitting the funds to the Mexican government or any taxing authority.

169.    None of the defendant airlines made any of these required disclosures.  Instead, the defendants concealed from the plaintiffs and the class members that defendants had no right to charge them the Tax, they owed plaintiffs and the Class a refund for the Tax funds, they had self-imposed obligations to Mexico to avoid charging the Tax to Exempt Travelers and to refund improperly charged Tax funds, and that they intended to, and did, keep the unlawfully charged Tax funds for themselves.

170.    At the time they made their misrepresentations and omissions, each defendant knew each of the following:

      a.    The defendants had no right to collect the Tax from Exempt Travelers;

      b.    The defendants had a duty to distinguish between exempt and non-Exempt Travelers;

      c.    The defendants did not distinguish between exempt and non-Exempt Travelers, except at the time they funneled the monies paid by Exempt Travelers to their own accounts;

      d.        By including the Tax as a line item in ticket-invoices to Exempt Travelers, the defendants were representing to those travelers that they had the right to collect this Tax, and the Tax was owed by the Exempt Travelers;

      e.        The Exempt Travelers would pay the Tax in reliance on the defendants' representations and omissions;

      f.        The defendants did not tell Exempt Travelers they did not owe the Tax, and Exempt Travelers had no reasonable means to realize they were being charged a tax they did not owe; and

      g.        The defendants had no meaningful program to refund improperly collected Tax funds to Exempt Travelers.

171.    Defendants intended that plaintiffs and the class members rely on defendants' representations that plaintiffs and the class owed the Tax, defendants had a right to charge them the Tax, and that the Tax funds were for the benefit of Mexico.

172.    Plaintiffs and the class did rely on defendants' misrepresentations or omissions, and this reliance is not proven on an individual basis, but with class-wide proof.  The payment itself proves uniform reliance by the class.  No rational person would pay a tax they did not owe.  No rational person would pay a tax to benefit Mexican tourism if it was disclosed that the tax money was not remitted to Mexico for tourism or for any other purpose, but was retained by the private tax collector who did not ever have the right to collect the tax in the first place.  Any argument that reliance and the attendant payment are somehow "individual" or unique considerations would be pure sophistry.

173.    Plaintiffs and the class were harmed by defendants' misrepresentations and omissions.  Each of the Exempt Travelers paid a tax they did not owe.

174.    Each defendant benefited from their fraudulent misrepresentations and omissions, and the concealment of this fraud.  Each defendant airline kept the unlawfully collected Tax funds for themselves.

D. <u>COUNT FOUR:</u>  UNJUST ENRICHMENT

175.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

176.    Plaintiffs and the class also allege in the alternative that they have no adequate remedy at law and bring this unjust enrichment claim on behalf of the class.

177.    Plaintiffs and the class conferred monetary benefit to the defendant airlines in the form of the funds charged by, and paid to, defendants for a Tax they did not owe.

178.    At the time the defendants charged the Tax to the plaintiffs and class members, they knew or should have known, and had a self-imposed obligation to know, the Tax was not owed.

179.    The defendants knew with certainty which Exempt Travelers did not owe the Tax, and knew with certainty how much the Exempt Travelers paid for a tax they did not owe.

180.    The defendants made no meaningful attempt to inform improperly charged Exempt Travelers they were unlawfully charged the Tax or that they had a right to a refund of the Tax funds, and failed to fulfil their self-imposed obligation to maintain a meaningful system to refund improperly charged Tax funds.

181.    The defendants knowingly kept the unlawfully gained Tax funds for themselves.

182.    As a result of defendants' conduct, plaintiffs and the class suffered actual damages measured by the amount of Taxes paid by plaintiffs and the class to defendants.

183.    Under principles of equity and good conscience, defendants should not be permitted to retain the money belonging to plaintiffs and the class because defendants have no right to that money.

184.    Defendants should be compelled to disgorge into a common fund for the benefit of the plaintiffs and the class members all unlawful or inequitable proceeds received by defendants.

185.    A constructive trust should be imposed upon all unlawful or inequitable sums received by defendants, which were paid by the plaintiffs and the Class.

E.   **COUNT FIVE:  MONEY HAD AND RECEIVED**

186.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

187.    As a result of the payments made by the plaintiffs and the class for the Tax charged by defendants, defendants gained an enormous amount of money for their own use and benefit.

188.    By charging the Tax to Exempt Travelers that was not owed Exempt Travelers, defendants became indebted to the plaintiffs and the class members.

189.    No part of any of the monies due and owing to the plaintiffs and class members has been repaid, although plaintiffs and class members demand repayment.  Therefore, also in the alternative, plaintiffs seek repayment of the Tax funds had and received by defendants.

VII.    **PRAYER FOR RELIEF**

The plaintiffs, for themselves and for the class they represent, request the following relief:

a.    That the Court determine this action may be maintained as a class action under Federal Rules 23(b)(2) and 23(b)(3), and certification this as a class action;

b.    That the Court enter judgment against the defendants, jointly and severally, in favor of plaintiffs and the Class;

c.    That the Court award damages in the amount of the injury to business incurred by the named plaintiffs and the class as a result of defendants' conduct and for injury to their business and property, all as a result of defendants' violations of 18 U.S.C. § 1962(a), (c) and (d), as a result of defendants violations of Section 1 of the Sherman Act, and that such sum be trebled in accordance with 18 U.S.C. § 1964(c) and the Sherman Act.

d.    That the Court issue temporary and permanent injunctive relief enjoining the defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, or continuing the scheme by which they are improperly charging class members with the Mexico Tourism Tax and are concealing from the class members' exemption from

the tax and right either not to have the tax collected or to have the amount of the tax refunded;

e.    That the Court issue temporary and permanent injunctive relief enjoining and restraining the defendants from directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition;

f.    Disgorgement of all proceeds of the scheme detailed in this complaint by each defendant;

g.    That the Court award plaintiffs and the Class costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c), the Sherman Act; and Federal Rule 23(h); and

h.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## VIII.   **DEMAND FOR A JURY TRIAL**

Pursuant to Federal Rule 38(b), the plaintiffs, for themselves and on behalf of the Class they represent, demand a trial by jury of the RICO Act and Sherman Act claims, and any other claims so triable asserted in this lawsuit.

Respectfully submitted, March 1, 2019.

GOLDSTEIN & RUSSELL, P.C.

/s/ Tejinder Singh
Tejinder Singh (Bar No. 17888)
tsingh@goldsteinrussell.com
Eric F. Citron (*application for admission to be filed*)
ec@goldsteinrussell.com
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
Facsimile: (866) 574-2033

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg (*pro hac vice to be filed*)
mprebeg@pfalawfirm.com
Christopher Faucett (*pro hac vice to be filed*)
cfaucett@pfalawfirm.com

Stephen W. Abbott (*pro hac vice to be filed*)
sabbott@pfalawfirm.com
Brent T. Caldwell (*pro hac vice to be filed*)
bcaldwell@pfalawfirm.com
8441 Gulf Freeway, Suite 307
Houston, TX 77017
Telephone: (832) 743-9260
Facsimile: (832) 742-9261

NIX PATTERSON LLP
Austin Tighe (*pro hac vice to be filed*)
atighe@nixlaw.com
Michael Angelovich (*pro hac vice to be filed*)
mangelovich@nixlaw.com
3600 N Capital of Texas Hwy
Suite B350
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335

MORROW & SHEPPARD LLP
John D. Sheppard (*pro hac vice to be filed*)
jsheppard@morrowsheppard.com
Nicholas A. Morrow (*pro hac vice to be filed*)
nmorrow@morrowsheppard.com
3701 Kirby Dr., Ste. 1000
Houston, TX 77098
Telephone: (713) 489-1206
Facsimile: (713) 893-8370

***Attorneys for Plaintiffs***