IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **NOEL MORAN ROJAS,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | | **Case No.: GJH-19-665** |
| | * | |
| **DELTA AIRLINES, INC.,** *et al.*, | * | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs bring this action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, by certain Defendants, and violations of the Sherman Act, 15 U.S.C. § 1, and claims of fraud and fraudulent omission or concealment, unjust enrichment, and money had and received against all Defendants. ECF No. 89. The action stems from an unreimbursed "Mexican Tourism Tax" that Plaintiffs paid to Defendant airlines in connection with air travel from the United States to Mexico. ECF No. 89. Pending before the Court are Motions to Dismiss or Transfer filed by each of the eight Defendants: Delta Airlines, Inc. ("Delta"), United Airlines, Inc. ("United"), American Airlines, Inc. ("American"), Aerovias De Mexico S.A. De C.V. ("AeroMexico"), ABC Aerolíneas, S.A. De C.V. ("Interjet"), Aeroenlaces Nacionales, S.A. De C.V. ("Viva Aerobus"), Southwest Airlines, Co. ("Southwest"), and JetBlue Airways Corporation ("jetBlue"). ECF Nos. 92–99. As part of their response to Defendants' Motions, Plaintiffs have filed a Conditional Motion for Leave to Amend. ECF No. 105. No hearing is necessary to resolve the pending motions. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendants' Motions to Dismiss or

Transfer are granted, in part, and denied, in part, and Plaintiffs' Conditional Motion for Leave to Amend is denied.

## I. BACKGROUND[1]

Plaintiffs represent a proposed class of Mexican nationals, guardians of children under the age of two, and foreigners with resident status in Mexico who purchased airfare from Defendants for flights from the United States to Mexico between June 30, 1999 and the present and whose purchase prices included a "Mexico Tourism Tax" ("Tax") that was not reimbursed by the time the instant lawsuit was filed. ECF No. 89 ¶ 111. Defendants are airlines that provide transportation from the United States to Mexico. *Id.* ¶ 4. Delta, United, American, Southwest, and jetBlue are incorporated and headquartered in the United States, *id.* ¶¶ 28–30, 34–35; AeroMexico, Interjet, and Viva Aerobus are Mexican corporations doing business and having registered agents for service of process in the United States, *id.* ¶¶ 31–33. Defendants are all members of Camera Nacional de Aerotransportes ("CANAERO"), an association of airlines that transport passengers to and from different countries, including Mexico and the United States. *Id.* ¶ 4.

### A. The Tax and CANAERO

The Mexican government requires all noncitizens entering the country to pay a Tax to the government. *Id.* ¶ 1. In 1999, the Mexican government entered into a contractual arrangement with CANAERO ("CANAERO Contract") through which the CANAERO airlines would collect the Tax on behalf of the Mexican government and then remit the collected fees to the government. *Id.* ¶¶ 4–5; *see generally* ECF Nos. 89-1, 89-2 (CANAERO Contract and

---

[1] Unless otherwise stated, the background facts are taken from Plaintiffs' Amended Complaint, ECF No. 89, and are presumed to be true.

Procedures).[2] The CANAERO Contract provides that "[t]he collection of the [Tax] shall be included in the airline ticket," ECF No. 89-1 at 9, and "[t]he charge shall appear on the ticket, using the code 'UK,'" ECF No. 89-2 at 3.

The CANAERO Contract contains three requirements relevant to this lawsuit. First, the CANAERO airlines may not collect the Tax from certain individuals, including Mexican citizens, children under the age of two, and foreigners residing in Mexico ("Exempt Travelers"), because those individuals are exempt from the Tax under Mexican law. *Id.* at 2. Second, the CANAERO airlines are required "[t]o determine the cases in which the [Tax] is not applicable." ECF No. 89-1 at 7. And third, the airlines are required to "make the appropriate reimbursements" when the Tax is collected from an Exempt Passenger. *Id.* In particular, the CANAERO Procedures provide that:

> If the [Tax] is mistakenly collected from an Exempt [Passenger], upon issuing that ticket, and this is asserted by the passenger, he may be reimbursed through the sales conduit or channel, provided that the following is complied with:
>
> A) The passenger proves, by the presentation of the ticket, that he was charged the [Tax], and it is noted on such, with the applicable code and amount.
>
> B) The passenger proves that he is exempt from payment by a suitable official document issued by Mexican authorities.

ECF No. 89-2 at 3. Once the airlines collect the Tax, they must then remit the amounts collected to the Mexican government, along with a report of the total number of passengers on each flight and the total number of passengers from whom the Tax should have been collected. ECF No. 89 ¶ 8.

---

[2] The CANAERO Contract and CANAERO Procedures are included as attachments to the Amended Complaint, so the Court will consider them as part of the pleadings. *See* Fed. R. Civ. P. 10(c).

### B. Plaintiffs' Airline Ticket Purchases

Until recently, Defendants never disclosed the existence of the CANAERO Contract or affirmatively notified Exempt Passengers that they were exempt from the Tax. *Id.* ¶ 72–73. Instead, Plaintiffs allege that, in carrying out their obligations under the CANAERO Contract, Defendants have not distinguished between Exempt Passengers and non-Exempt Passengers in charging the Tax, *id.* ¶ 7, and have collected the Tax from Exempt Passengers as follows:

- On January 14, 2015, Plaintiff LuzMaria Armendaiz De Arroyo, a Mexican citizen residing in Austin, Texas, purchased an airline ticket from United to travel from Houston, Texas to Monterrey, Mexico. *Id.* ¶ 23. United charged her a Tax in the amount of $22.97. *Id.*

- On February 27, 2015, Plaintiff Patricio Mercado, a Mexican citizen residing in Austin, purchased an airline ticket from Viva Aerobus to travel from Houston to Monterrey. *Id.* ¶ 24. Viva Aerobus charged him a Tax in the amount of $342.12 Pesos. *Id.*[3]

- On March 28, 2015, Plaintiff Ruben Alfonso Arroyo, a Mexican citizen residing in Sparta, New Jersey, purchased an airline ticket from Delta to travel from St. Louis, Missouri to Monterrey. *Id.* ¶ 27. Delta charged him a Tax in the amount of $22.28. *Id.*

- On September 21, 2015, Plaintiff Mayra Luisa Castillo Casteneda, a Mexican citizen residing in Chicago, Illinois, purchased an airline ticket from Southwest to travel from Chicago to Mexico City, Mexico. *Id.* ¶ 22. Southwest charged her a Tax in the amount of $20.11. *Id.*

---

[3] Plaintiffs have not provided the equivalent U.S. Dollar amount.

- On April 11, 2016, Plaintiff De Arroyo purchased another airline ticket from United to travel from Houston to Mexico City. *Id.* ¶ 23. United charged her a Tax in the amount of $22.07. *Id.*

- On February 3, 2017, Plaintiff Teresa Estrada-Jimenez, a Mexican citizen residing in Houston, purchased an airline ticket from United to travel from Houston to Mexico City. *Id.* ¶ 26. United charged her a Tax in the amount of $23.37. *Id.*

- On March 13, 2017, Plaintiff Estrada-Jimenez purchased a second ticket from United to travel from Houston to Guadalajara, Mexico. *Id.* United charged her a Tax in the amount of approximately $20.00 to $25.00. *Id.*

- On January 14, 2018, Plaintiff Olivia Isabel Gonzales, a Mexican citizen residing in Austin, purchased an airline ticket from United to travel from Houston to Monterrey. *Id.* ¶ 21. United charged her a Tax in the amount of $22.97. *Id.*

- On May 25, 2018, Plaintiff Noel Moran Rojas, a Mexican citizen residing in Riverdale, Maryland, purchased an airline ticket from Delta to travel from Baltimore, Maryland to Mexico City. *Id.* ¶ 19. Delta charged him a Tax in the amount of $29.05. *Id.*

- On June 20, 2018, Plaintiff Alexandra Almanza, a Mexican citizen residing in Chicago, purchased an airline ticket from jetBlue to travel from Washington, D.C. to Mexico City. *Id.* ¶ 25. jetBlue charged her a Tax in the amount of $27.40. *Id.*

- On June 20, 2018, Plaintiff Almanza also purchased an airline ticket from American to travel from Dallas, Texas to Mexico City. *Id.* American charged her a Tax in the amount of $27.69. *Id.*

- On October 4, 2018, Plaintiff Miguel Hilarion Jimenez, a Mexican citizen residing in Houston, purchased an airline ticket from AeroMexico to travel from Houston to Mexico City. *Id.* ¶ 20. AeroMexico charged him a Tax in the amount of $28.00. *Id.*

- On October 4, 2018, Plaintiff Jimenez purchased another airline ticket from Interjet to travel from Houston to Mexico City. *Id.* Interjet charged him a Tax in the amount of $27.69. *Id.*

The Tax was not apparent on the face of Plaintiffs' airline tickets; rather, it showed up as a line-item charge "buried in the details of the costs and fees of each ticket purchased." *Id.* ¶ 39. Defendants collected the Tax from Plaintiffs and other Exempt Passengers "despite collecting, registering, knowing, and/or having constructive knowledge of their passengers' passport numbers and nationalities." *Id.* ¶ 45. After collecting the Tax, Defendants kept the Tax for themselves, *id.* ¶ 186, and designed "illusory" refund procedures "to allow each airline to retain and keep all of the illegally-collected Tax funds," *id.* ¶ 74. There is no allegation that any Plaintiff or other class member requested a refund of the Tax with proof of Mexican citizenship and was denied reimbursement by a Defendant.

### C. Previous Litigation

Exempt Passengers have brought three previous lawsuits against many Defendants in this case based on their collection of the Tax. *Id.* ¶¶ 16, 98.

In *Sanchez v. Aerovias De Mexico, S.A. De C.V.*, 590 F.3d 1027 (9th Cir. 2010), the plaintiff and purported class sued AeroMexico for breach of contract and the implied covenant of good faith and fair dealing based on its collection of the Tax and failure to disclose the Exempt Passengers' exempt status and entitlement to a refund. *Id.* at 1028. The Ninth Circuit upheld the district court's grant of summary judgment in favor of AeroMexico on the basis that the Airline

Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(1), preempted the state law claims. *Id.* The court explained that although the ADA preempts "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier," it "does not 'shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings.'" *Id.* at 1029–30 (quoting 49 U.S.C. § 41713(b)(1) and *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995)). The court concluded, however, that the plaintiffs' claims were related to AeroMexico's prices and were not excepted from the ADA's preemption provision because the airline, through its website, had not undertaken a self-imposed contractual duty to the plaintiffs to collect the Tax from only non-Exempt Passengers or to notify Exempt Passengers of their exempt status or right to a refund. *Id.* at 1028, 1030–31.

In *McMullen v. Delta Air Lines, Inc.*, 361 F. App'x 757 (9th Cir. 2010), the plaintiff and purported class similarly brought a breach of contract claim against Delta based on its collection of the Tax from Exempt Passengers. *Id.* at 758. The Ninth Circuit affirmed the district court's dismissal of the claim. *Id.* The court explained that even assuming that the claim was not preempted because it did not relate to Delta's prices, routes, or services, or because it fell within the exception for self-imposed obligations, the claim would fail because neither of the provisions in Delta's contract of carriage to which the plaintiff pointed "obligate[d] Delta not to collect the [Tax] from all passengers to Mexico, regardless of whether they are exempt from the [T]ax." *Id.*

Finally, in *Almanza v. United Airlines, Inc.*, 162 F. Supp. 3d 1341 (S.D. Ga. 2016) ("*Almanza I*"), the plaintiffs and purported class sued United, Delta, American, AeroMexico, Interjet, U.S. Airways, Inc., and Concesionaria Vuela Compania De Aviacion, S.A.P.I De C.V. for RICO violations based on the airlines' collection of the Tax. *Id.* at 1344. Chief Judge Wood

dismissed the case as to all the airlines because the plaintiffs failed to sufficiently plead that the airlines were part of a "RICO enterprise" or engaged in "a pattern of racketeering" as required by RICO. *Id.* at 1356, 1358. The Eleventh Circuit affirmed Chief Judge Wood's dismissal on the ground that the plaintiffs failed to allege a "RICO enterprise" through "factual enhancements" pertaining to Defendants' unlawful conduct, non-competitive conduct, membership in CANAERO, and the CANAERO Contract. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069–75 (11th Cir. 2017) ("*Almanza II*").

### D. Plaintiffs' Current Lawsuit

On March 1, 2019, Plaintiffs, both individually and on behalf of similarly situated Exempt Passengers, filed a Complaint in this Court against Defendants based on their collection of the Tax. ECF No. 1. Plaintiffs amended the Complaint on May 21, 2019. ECF No. 89. Plaintiffs allege a RICO violation against Defendants Delta, United, American, AeroMexico, and Interjet ("the RICO Defendants") ("Count I"), and an antitrust violation ("Count II") and claims of fraud and fraudulent omission or concealment ("Count III"), unjust enrichment ("Count IV"), and money had and received ("Count V") against all Defendants. *Id.*

On June 7, 2019, the eight Defendants each filed separate Motions to Dismiss or Transfer. ECF Nos. 92–99. They ask the Court to dismiss the Amended Complaint or transfer the case to the Southern District of Georgia, where Chief Judge Wood previously dismissed the *Almanza* case. *Id.* On July 8, 2019 and July 10, 2019, respectively, Plaintiffs filed a consolidated opposition and supplemental opposition to Defendants' Motions. ECF Nos. 105, 107. Plaintiffs' consolidated opposition contained a Conditional Motion for Leave to Amend. ECF No. 105. Each Defendant filed a separate reply on August 5, 2019. ECF Nos. 108–115.

## II.  MOTIONS TO TRANSFER

Defendants ask the Court to transfer this case to the Southern District of Georgia where Chief Judge Wood previously ruled on a motion to dismiss a complaint that alleged a RICO violation against many of the same Defendants based on the same Tax collection practice. Pursuant to 28 U.S.C. § 1404(a), a court may transfer a civil action to any other district or division where it might have been brought "[f]or the convenience of the parties and witnesses, in the interest of justice." To determine whether transfer is appropriate, a court considers four factors: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interests of justice. *Trs. of the Plumbers and Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015). "[A] plaintiff's choice of forum is ordinarily accorded considerable weight," *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002), so "unless the balance of factors 'is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed,'" *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008) (quoting *Collins v. Straight Inc.*, 748 F.2d 916, 921 (4th Cir. 1984)). Here, the balance of factors does not weigh strongly in favor of Defendants, so the Court will decline to transfer the case.

Plaintiffs' choice of venue should be accorded "considerable weight." *See Lynch*, 237 F. Supp. 2d at 617. Although this weight is "significantly lessened" where the "forum has no connection with the matter in controversy," *see id.*, that is not the case here. One of the Plaintiffs resides in Maryland and one of the flights at issue originated in Maryland. The second two factors—convenience of parties and witnesses—are essentially neutral because neither Maryland nor Georgia are particularly convenient or inconvenient for the parties, potential witnesses, or counsel. Finally, the interests of justice do not require transfer. It is true that "[t]he interest of

justice weighs heavily in favor of transfer when a related action is pending in the transferee forum," *D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 783 (D. Md. 2009), because the presence of "two suits in different circuits involving a number of identical questions of fact and law would result in a useless waste of judicial time and energy," *Gen. Tire & Rubber Co. v. Watkins*, 373 F.2d 361, 368 (4th Cir. 1967). But this case does not present such a situation. There is no related action currently pending in the Southern District of Georgia, and although Chief Judge Wood dismissed a complaint based on the same Tax collection practice, that complaint only included a RICO claim; the Amended Complaint in the instant case contains four additional claims that have yet to be addressed by any court considering this Tax collection practice. This Court is in just as good a position to rule on those claims in the first instance as is the Southern District of Georgia. Because Plaintiffs chose this forum, the controversy has the same connection to both Georgia and Maryland, and the Southern District of Georgia did not previously address a majority of the claims in this case, transfer is not warranted and Defendants' requests to transfer this case are denied.

## III.    MOTIONS TO DISMISS

Defendants contend that the Amended Complaint must be dismissed for failure to state a claim, failure to join a party, lack of personal jurisdiction, lack of standing, and because some of the claims are time-barred.[4] Although "[a]s alleged by Plaintiffs, Defendants' conduct regarding the [Tax] is very troubling," *see Almanza II*, 851 F.3d at 1075, the Court agrees that the Amended Complaint fails to state a claim for which relief can be granted, so it must be dismissed.

---

[4] Although Defendants separately filed Motions to Dismiss, each explicitly incorporates the arguments of the other Defendants. Thus, the Court will consider Defendants' arguments collectively.

## A.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). However, Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB–12–237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). A motion to dismiss under 12(b)(6) "test[s] the adequacy of a complaint." *Prelich v. Med. Res., Inc.*, 813 F. Supp. 2d 654, 660 (D. Md. 2011) (citing *German v. Fox,* 267 F. App'x 231, 233 (4th Cir. 2008)). Motions to dismiss for failure to state a claim do "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Prelich*, 813 F. Supp. 2d at 660 (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)). To overcome a Rule 12(b)(6) motion, a complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of the Plaintiff's claims, the Court accepts factual allegations in the complaint as true and construes them in the light most favorable to the Plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005). However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court should not grant a motion to dismiss for failure to state a claim unless "it is clear that no relief could be granted under any set of facts that could be proved consistent

with the allegations." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th

Cir. 2001) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50 (1989)).

Additionally, where, as here, a complaint alleges claims sounding in fraud, a party must

"state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Rule 9(b) requires "that a plaintiff alleging fraud must make particular allegations of the time,

place, speaker, and contents of the allegedly false acts or statements." *Adams v. NVR Homes,

Inc.*, 193 F.R.D. 243, 249–50 (D. Md. 2000); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,

525 F.3d 370, 379 (4th Cir. 2008) (describing the "who, what, when, where, and how" of the

fraud claim). Despite these heightened requirements, "a court should hesitate to dismiss if it finds

(1) that the defendant[s] [have] been made aware of the particular circumstances for which [they]

will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence

of those facts." *Nat'l Mortg. Warehouse, LLC v. Trikeriotis*, 201 F. Supp. 2d 499, 505 (D. Md.

2002) (describing pleading requirements in case of fraudulent conveyance) (internal citations

omitted).

### B. Discussion

#### i. RICO Claim (Count I)

Plaintiffs claim that Defendants violated RICO by agreeing among themselves to

fraudulently collect the Tax from Exempt Passengers and keep those funds for themselves. ECF

No. 89. Pursuant to § 1962(c) of RICO, "[i]t shall be unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §

1962(c). It is also unlawful to conspire to commit a § 1962(c) violation. 18 U.S.C. § 1962(d). To

plausibly allege a § 1962(c) violation, the plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrez Co.*, 473 U.S. 479, 496 (1985). To plausibly allege a conspiracy to commit a RICO violation, the plaintiff must allege that the defendant conspired to participate in the RICO enterprise and pattern of criminal activity and had the same criminal objective as the other conspirators. *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017). Plaintiffs have failed to allege either a RICO enterprise or a pattern of racketeering. Thus, Count I will be dismissed.[5]

### a. RICO Enterprise

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). It requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit for a common purpose; and (3) the enterprise is an entity separate and apart from the pattern of activity in which it engages. *See United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477–78 (D. Md. 2009). Importantly, a RICO enterprise requires the existence of collaboration or agreement between the members of the enterprise.[6] *See Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009); *In re Ins.*

---

[5] Additionally, because Plaintiffs have failed to state a claim under § 1962(c), "[their] charge of conspiracy to violate RICO pursuant to § 1962(d) is also without merit," and it must also be dismissed. *Kimberlin v. Nat'l Bloggers Club*, Case No. GJH–13–3059, 2015 WL 1242763, at *3 n.2 (D. Md. 2015) (quoting *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 275 (4th Cir. 2010)) (internal quotations omitted).

[6] Plaintiffs attempt to argue that an agreement among the alleged members of the enterprise is not a requirement. ECF No. 105 at 46–47. However, some level of coordination is necessary in order for enterprise members to function as a continuing unit for a common purpose. *See Griffin*, 660 F.2d at 999. Indeed, as the Supreme Court stated in *Boyle*, "[i]t is easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not establish the existence of an enterprise. For example, suppose that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates—for example, bribery or extortion. Proof of these patterns would not be enough to show that the individuals were members of an enterprise." *Id.* at 947 n.4.

*Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) (stating that the RICO enterprise element is a "close analogue" of the agreement element in antitrust law, and plaintiffs must "allege something more than the fact that individuals were engaged in the same type of illicit conduct during the same time period").

Plaintiffs contend that the Amended Complaint adequately pleads an association-in-fact enterprise by alleging that Defendants have a side-agreement to collect the Tax from Exempt Passengers and keep the funds for themselves, are collectively involved in CANAERO and the CANAERO Contract, are engaged in non-competitive conduct, and have identical Tax collection and refund procedures. ECF No. 105 at 44–48.[7] Plaintiffs point to allegations in the Amended Complaint that state Defendants "agreed among themselves, and coordinated their efforts, to each charge the Tax that was not owed to Mexican citizens, to each keep or save the unlawfully collected funds for themselves, [] to each employ a relatively uniform method of illegally charging the Tax to Mexican citizens and retaining those funds, and [] to resist efforts by Mexico to extinguish their authority to collect the Tax on behalf of Mexico." ECF No. 89 ¶ 13; *see id.* ¶¶ 56, 128. These allegations describe meetings involving Defendants' representatives that were held "on numerous occasions" over a general time-period spanning many years, *id.* ¶ 14; *see id.* ¶¶ 50–57, 127, identify individuals who may have been present at these meetings, *id.* ¶ 57, and explain CANAERO's committee and subcommittee structure, selection of and communication with CANAERO's Managing Director, Gabriel Ortega Alcocer, and Mr. Ortega's negotiation of the CANAERO Contract with the Mexican government, *id.* ¶¶ 15, 50–60. These allegations do not sufficiently plead a RICO enterprise.

---

[7] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

The Amended Complaint's general allegation that "a collective decision was made" by all Defendants to improperly charge and keep the Tax cannot properly establish a RICO enterprise. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 437 (4th Cir. 2015) (finding no agreement in the context of an antitrust case where plaintiffs alleged only that "a collective decision was made," but provided no other specific facts to establish the alleged illegal agreements). That Defendants reached an express or tacit agreement to fraudulently collect the Tax is conclusory, and Plaintiffs fail to provide any specific allegations as to how, when, or where this agreement actually occurred or who made what communications to bring the agreement about.[8] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (instructing courts to ignore allegations in a complaint that are merely legal conclusions or formulaic recitations of the elements of a claim); *id.* at 557 (stating that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 473 (D. Md. 2012) (dismissing a RICO complaint that "contain[ed] no factual averments regarding the relationships between or among Defendants, much less how they functioned as a continuing unit" (internal quotations omitted)).

Without the conclusory allegations regarding an agreement to illegally charge the Tax, Plaintiffs are left with their allegations that Defendants "engaged in identical conduct that demonstrates an agreement to wrongfully collect the Tax" by charging the same Tax, violating the same terms of the CANAERO Contract, maintaining an infeasible Tax refund system, and

---

[8] The only specific communications to which the Amended Complaint refers are statements made by Cesar Laguna, AeroMexico's Vice President Comptroller, in a declaration filed in *Sanchez*. ECF No. 89 ¶¶ 108, 109. Plaintiffs characterize Mr. Laguna's statements as "admit[ting] that there was an agreement or understanding among the member defendants at that time that each will charge the [Tax] to all passengers, including the Exempt [Passengers]." *Id.* ¶ 108. The actual declaration, however, states only that Mr. Laguna "believe[d] that … United Airlines, American Airlines, and other airlines which fly routes into Mexico all provide this service to their passengers." *Id.* ¶ 108. Contrary to Plaintiffs' assertion, this statement is silent as to whether an agreement existed, let alone the specifics of how that agreement came to exist.

falsely reporting information about their Tax collection scheme to the Mexican government. ECF No. 89 ¶ 129; *see* ECF No. 105 at 45–47. These allegations are insufficient to sustain Plaintiffs' RICO claim because "RICO does not penalize parallel, uncoordinated fraud." *See United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) (citing *Boyle*, 556 U.S. at 947 n.4). Nor is the RICO claim saved by the Amended Complaint's allegation that "[t]here is no doubt these defendant airlines were aware of their collective unlawful actions," ECF No. 89 ¶ 66; *see also* ECF No. 89 ¶¶ 64–66, 75–76, 78–81, 97 (describing Defendants' individual admissions to Mr. Alcocer that they were collecting the Tax from Exempt Passengers and their parallel responses to Mexican government officials that inquired about the airlines' collection of the Tax from Exempt Passengers); rather, this allegation of general awareness demonstrates only that Plaintiffs engaged in consciously parallel conduct, which is not sufficient to satisfy *Twombly*'s pleading standard, *see Almanza II*, 851 F.3d at 1069 (citing *Twombly*, 550 U.S. at 553–54); *SD3*, 801 F.3d at 424 (stating that "conscious parallelism" is not enough to establish a common scheme to achieve an unlawful objective); *Conn. Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC*, Case No. 14–2376–DKC, 2015 WL 4394408, at *15 (D. Md. July 15, 2015) (dismissing a RICO claim where the complaint alleged that each defendant engaged in wrongful activity, but did not contain any allegations that this was "coordinated conduct performed on behalf of a distinct enterprise").

Allegations regarding Defendants' membership in CANAERO, a trade association, do not raise the parallel conduct to the level of an association-in-fact enterprise because they do not plausibly suggest that the CANAERO members "are functioning as an ongoing, organized, structured enterprise in conducting [the Tax collection scheme]." *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 142 (S.D.N.Y. 2014), *aff'd in relevant part*, *Babb v. CapitalSource, Inc.*, 588 F.

App'x 66 (2d Cir. 2015); *see Consol. Metal Prods., Inc. v. Am. Petroleum Instit.*, 846 F.2d 284, 293 (5th Cir. 1988) ("[A] trade association is not by its nature a 'walking conspiracy.'"). The Amended Complaint contains no facts that suggest CANAERO was a conduit for Defendants' alleged Tax collection scheme, or that the existence of CANAERO and Defendants' interactions with Mr. Alcocer were for any purpose other than to negotiate and implement the CANAERO Contract. *See Almanza II*, 851 F.3d at 1071–73 (finding that allegations regarding airlines' membership in CANAERO failed to establish a RICO enterprise).

The Amended Complaint's allegations regarding Defendants' status as competitors similarly does not raise their parallel conduct to the level of a RICO enterprise. The Amended Complaint states Defendants' Tax scheme "needed … close cooperation because without it, at least two situations would result. First, and at least in the earlier stages of the scheme, if any one of them had done so alone, without coordination amongst the other defendant members of CANAERO, it would be in serious danger of being turned in by its competitors to Mexican authorities. Second, if only one of them used this outrageous practice of overcharging each Exempt [Passenger] an amount typically ranging between $20 to $30 per ticket, it would be at a competitive disadvantage to the other carriers." ECF No. 89 ¶ 9. Allegations of "parallel conduct that could just as well be independent action" or facts that are "just as much in line" with unilateral conduct are insufficient, however, to plead a coordinated effort to achieve a common purpose. *See Twombly*, 550 U.S. at 554, 557. As the *Almanza* court stated, "Plaintiffs have not explained why their economic model should be accepted as plausible," and Defendants' actions "were [not so] economically irrational so as to explain away parallel conduct." 851 F.3d at 1071. Indeed, Defendants actions are just as consistent with legal action as they are with illegal action, and there are "obvious alternative explanation[s]" for the parallel conduct, *see Twombly*, 550

U.S. at 567, including that Defendants are all subject to the same obligations and procedures in the CANAERO Contract and may have independently determined that it was more cost-efficient to collect the Tax uniformly and then reimburse it at a later date, rather than set up new procedures to distinguish between Exempt Passengers and non-Exempt Passengers, or that if they did not collect the Tax uniformly they might lose customers due to long lines and delays. Indeed, in a "concentrated market[] [such as the airline industry where competitors] watch each other like hawks," *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 875 (7th Cir. 2015), it is a "common reaction" to consciously make interdependent decisions with respect to price, and these decisions are not unlawful on their own, *Twombly*, 550 U.S. at 555. Plaintiffs have therefore pled no facts to suggest that Defendants' parallel conduct is anything more than the result of independent economic decisions or interdependence in a concentrated market. Because the Amended Complaint fails to plead a RICO enterprise, Count I will be dismissed.

### b. Pattern of Racketeering

Even if Plaintiffs could plausibly allege a RICO enterprise, their RICO claim would still fail because the Amended Complaint fails to allege a pattern of racketeering. To allege a pattern of racketeering activity, a plaintiff must allege that "at least two predicate acts of racketeering occurred within ten years of each other." *Grant*, 871 F. Supp. 2d at 473. Here, Plaintiffs claim predicate acts of mail and wire fraud. ECF No. 89 ¶¶ 137–140.

Mail or wire fraud occurs where a party engages in a scheme to defraud and uses the mails or wires in furtherance of that scheme. *See Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996) (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)). A scheme to defraud exists where a party makes material misrepresentations, fails to disclose material information, or conceals material facts. *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012); *see also*

*United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (A "scheme to defraud" involves proof of "a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."). The Fourth Circuit is "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *GE Inv. Private Placement Partners*, 247 F.3d at 549 (quoting *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000)) (internal quotations omitted); *Kimberlin*, 2015 WL 1242763, at *13 (stating that courts should be wary of "attempt[s] to plead a RICO suit from an ordinary civil wrong"). Plaintiffs contend that Defendants engaged in a scheme to defraud by making misrepresentations regarding Defendants' authority to collect the Tax, Plaintiffs' exempt status, and the availability of Tax refunds, and that because Defendants used the mails and wires in furtherance of this scheme, they committed predicate acts of mail and wire fraud. ECF No. 89 ¶¶ 140–144. The Court disagrees.

As a preliminary matter, Plaintiffs' allegations regarding mail and wire fraud fail to provide the required level of particularity. *See Proctor*, 645 F. Supp. 2d at 473 (stating that alleging fraudulent conduct as predicate act for a RICO violation "requires pleading the time, place, and content of the false representations, the person making them, and what that person gained from them" (internal quotations omitted)). Although Plaintiffs allege generally that Defendants misrepresented that the Tax was owed and designed illusory refund procedures, ECF No. 89 ¶ 176, these "threadbare allegations are not enough to satisfy the particularity requirement imposed by [Rule] 9(b)" because Plaintiffs do not identify any specific misrepresentations or the role that each Defendant played. *See Kimberlin*, 2015 WL 1242763, at *5. The only specific statements of allegedly false information to which the Amended Complaint refers are the line-item charges in the ticket invoices stating that Plaintiffs had been charged the Tax and the

amount that they had been charged. *See, e.g*, ECF No. 89 ¶¶ 7, 39, 139, 176. These line-item charges are not affirmative misrepresentations of material fact, however. Rather, "Defendants' inclusion of the line-item charge on a ticket or confirmation would have amounted only to a representation that Defendants assessed this fee as part of the purchase price—a representation that was, in fact, true. This charge does not constitute a false statement that Defendants were permitted to tax Plaintiffs and other Exempt Passengers under the CANAERO Contract, or that these passengers were obligated to pay the same under Mexican law." *Almanza I*, 162 F. Supp. 3d at 1357; *see also Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 273 (4th Cir. 2010) ("RICO's remedies are not appropriate for 'the ordinary run of commercial transactions'"); *Braswell Wood Co. v. Waste Away Grp., Inc.*, Case No. 2:09–CV–891–WKW [WO], 2010 WL 3168125, at *4 (M.D. Ala. 2010) (finding no misrepresentation where an invoice accurately described charges, even where those charges may not have been permitted under a related contract); *Gifford v. Don Davis Auto, Inc.*, 274 S.W.3d 890, 895–96 (Tex. 2008) (finding that inclusion of a dealer's inventory tax on an invoice was not a representation that the buyer was obligated under law to pay that amount, but was simply "a charged amount payable" by the buyer to the dealer).

Moreover, even if the line-item charge could be interpreted as an affirmative misrepresentation, Plaintiffs have made no argument that it is an affirmative misrepresentation of *fact*. Plaintiffs attempt to frame the line-item charge as a misrepresentation of Defendants' authority to collect the Tax under a contract with the Mexican government and Plaintiffs' obligation to pay the Tax under Mexican law, thus making it a misrepresentation of law that cannot be the basis for a predicate act of fraud. *See S. Snow Mfg., Co. v. SnoWizard Holdings, Inc.*, 912 F. Supp. 2d 404, 421 (E.D. La. 2012) (granting motion to dismiss RICO claim based on

defendant's representations to the public regarding its intellectual property rights because "fraud cannot be predicated upon misrepresentations of law"); *Seale v. Miller*, 698 F. Supp. 883, 901 (N.D. Ga. 1988) (stating that "fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law").[9]

Nor, as Plaintiffs claim, does the Amended Complaint allege any actionable omission or concealment based on Defendants' failure to disclose the terms of the CANAERO Agreement, failure to notify Exempt Passengers of their right not to have the Tax collected from them, or failure to notify Exempt Passengers of their right to be refunded the amount of the Tax if collected in error. ECF No. 89 ¶¶ 72, 73. Nondisclosure and concealment cannot constitute mail or wire fraud unless the defendant has a duty to disclose and is silent or suppresses a material truth with the intent to deceive. *See United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000). Plaintiffs contend that the CANAERO Contract created a duty to disclose because it obligated Defendants to determine cases in which the Tax was inapplicable. ECF No. 105 at 55. But Plaintiffs present no authority for why such an obligation imposed "any legal or contractual duty [toward Plaintiffs] to disclose at the time of sale that [Defendants] had agreed not to assess the Tax against Exempt Passengers, that these passengers were exempt, or that a reimbursement procedure was available." *See Almanza I*, 162 F. Supp. 3d at 1357–58. In terms of fraudulent concealment, Plaintiffs cite only to allegations that "none of the defendants publicly disclosed the terms of the CANAERO Agreement, or at least until very recently otherwise expressly notified Exempt [Passengers] of their right not to have the Tax collected from them, or to be refunded the amount of the Tax if collected in error." ECF No. 89 ¶ 72. As the Court already

---

[9] Plaintiffs argue that whether Defendants made material misrepresentations is a triable issue that should not be decided at this stage. ECF No. 105 at 55. While it is certainly true that whether a misrepresentation is material is a question of fact, the Court must first determine whether the Amended Complaint alleges a misrepresentation. It does not.

explained, these allegations are nonactionable omissions; they are not specific "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter" that would constitute affirmative efforts to suppress information regarding the Tax, Defendants' authority to collect it, or the availability of refund procedures, *see Colton*, 231 F.3d at 899.

Finally, to the extent that Plaintiffs attempt to rely on misrepresentations that Defendants allegedly made to third-parties, such as Mexican government representatives or the U.S. courts in previous iterations of this case, there is no "sufficiently direct relationship" between these statements and the harm to Plaintiffs. *See Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 14 (2010) (internal quotations omitted). With respect to the Mexican government, Plaintiffs contend that Defendants lied, made false promises, and intentionally deceived Mexico with respect to their Tax collection and refund procedures and without these misrepresentations, Plaintiffs would not have been harmed because the Mexican government would have dismantled Defendants' alleged scheme. ECF No. 105 at 38–39. This "theory of liability rests on the independent actions of third[-parties]" by assuming that the Mexican government would have taken those steps had it known the truth, so the causal link is too attenuated for those alleged misrepresentations to serve as the basis for Plaintiffs' RICO claim. *See Hemi Grp.*, 559 U.S. at 15. With respect to any failure to disclose the existence of the CANAERO Contract to the presiding courts in previous litigation, Plaintiffs have failed to explain why that failure to disclose is actionable fraud that can serve as a predicate act for their RICO claim in this case. Thus, those alleged misrepresentations also cannot serve as the basis for Plaintiffs' RICO claim. Because Plaintiffs have failed to allege an affirmative misrepresentation or actionable omission

or concealment, the Amended Complaint does not plausibly plead a predicate act of mail or wire fraud. The RICO claim is therefore also subject to dismissal for this reason.

### ii.    Antitrust Claim (Count II)

Plaintiffs claim that Defendants violated antitrust laws by engaging in concerted action to unlawfully inflate the prices of airlines tickets by charging the Tax and keeping it for themselves. ECF No. 89 ¶¶ 158–161. Section 1 of the Sherman Antitrust Act prohibits a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce …" 15 U.S.C. § 1. "To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *SD3*, 801 F.3d at 423–24 (quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013)) (internal quotations omitted).

"Section 1 applies only to concerted action that restrains trade," *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010), and therefore "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express," *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 340 U.S. 537, 540 (1954)) (internal quotations and punctuation omitted). An antitrust conspiracy does not exist where there is "nothing beyond parallel conduct," *id.* at 554, but it may exist where a plaintiff provides "plus factors" that suggest the "parallel behavior would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" or alleges "further circumstances pointing toward a meeting of the minds," *SD3*, 801 F.3d at 424, 430 (quoting *Twombly*, 550 U.S. at 556, 557 and *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013)) (internal quotations omitted). Any circumstantial evidence of conspiracy,

however, "must tend to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554. Indeed, Section 1's agreement element is "a close analogue" of the enterprise element of a RICO claim. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370.

Plaintiffs' antitrust claim is based on the same parallel conduct that the Court has found insufficient to support Plaintiffs' RICO claim; this conduct is similarly insufficient to support an antitrust conspiracy because Plaintiffs have failed to "identif[y] the particular time, place, and manner in which the [antitrust conspiracy] initially formed." *See SD3*, 801 F.3d at 430 (dismissing an antitrust claim where "the complaint's only assertions of concerted action [were] conclusory and non-specific"). The Amended Complaint also fails to allege any plus factors that suggest the requisite "meeting of the minds." Plaintiffs primarily point to two such "plus factors" – Defendants' involvement in CANAERO and that they engaged in non-competitive conduct against their self-interest by collecting the Tax from Exempt Passengers. As the Court already explained in its discussion of Plaintiffs' RICO claim, Defendants' membership in CANAERO does not raise an inference of conspiracy on its own, and Plaintiffs have not alleged sufficient facts to suggest that Defendants' actions were so against their self-interest that they "rule out the possibility that the defendants were acting independently" and can only be explained by concerted action. *See Twombly*, 550 U.S. at 554. Thus, Plaintiffs' suggested plus factors do not raise the parallel conduct to the level of an antitrust conspiracy. The antitrust claim fails and will be dismissed.[10]

### iii.    Common Law Claims (Counts III, IV, and V)

The Amended Complaint alleges three common law claims based on Defendants' collection of the Tax: fraud and fraudulent concealment or omission, unjust enrichment, and

---

[10] Because the Court concludes that the Amended Complaint fails to plausibly allege an antitrust conspiracy, it need not address whether the alleged conspiracy created an unreasonable restraint on trade.

money had and received. ECF No. 89. Defendants contend that these claims must be dismissed because they are preempted by the ADA.

The goal of the ADA was to deregulate domestic air transport. *See Wolens*, 513 U.S. at 222. "To ensure that the States would not undo federal deregulation with regulation of their own," *id.* (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 372, 378), the ADA includes a preemption provision that prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1). The ADA's preemption provision does not, however, "shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Wolens*, 513 U.S. at 229 (finding that the ADA did not preempt breach of contract action alleging that airline had violated agreement that it had entered into with its passengers).

Here, the Defendants' collection of the Tax clearly relates to a "price, route, or service of an air carrier"; it relates to "price" because the Tax is collected by Defendants "as part of the price of the passenger ticket," and it relates to a "service" because "the collection of the [Tax] at the time of ticketing is a service facilitating the flow of passengers through the airports in Mexico." *See Sanchez v. Compania Mexicana de Aviacion S.A.*, Case No. CV 07–7196 R (RCx), 2008 WL 11411238, at *3 (C.D. Cal. 2008) (finding state law claims based on the airline's collection of the Tax preempted by the ADA). Nonetheless, Plaintiffs contend that their state law claims survive because the Tax collection practice satisfies the "self-imposed undertakings" exception to ADA preemption. They contend further that Defendants' collection of the Tax is "outrageous conduct" not subject to ADA preemption and is not immune from common law suits because the Tax is a matter of Mexican law, not federal law. The Court disagrees.

First, Plaintiffs have not alleged a breach of contract action, and the Court is skeptical that the "self-imposed undertakings" exception applies more broadly than to common law contract claims. *See Wolens*, 513 U.S. at 232–33 (stating that the ADA's preemption clause "stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated"). Regardless of whether the "self-imposed undertakings" exception is limited to breach of contract actions, however, Plaintiffs have not alleged that Defendants breached any commitment they made to Plaintiffs; rather, their contention is that Defendants breached terms in the CANAERO Contract that oblige them not to collect the Tax from Exempt Passengers. The CANAERO Contract is an agreement between CANAERO and Mexico, and because Plaintiffs have expressly disavowed any "standing under the CANAERO [Contract], either as direct signatories or as formal, third-party beneficiaries," ECF No. 105 at 77 n.39, they cannot also claim that their state law claims survive preemption based on some self-imposed obligation in the CANAERO Contract with respect to Plaintiffs.

Second, Plaintiffs proposed "outrageous conduct" exception does not actually exist in ADA jurisprudence. Plaintiffs' proffered authority, *Smith v. Comair, Inc.*, 134 F.3d 254 (4th Cir. 1998), states that "[s]uits stemming from outrageous conduct on the part of an airline toward a passenger will not be preempted under the ADA if the conduct too tenuously relates or is unnecessary to an airline's services." *Id.* at 259. This statement from *Smith* simply reiterates the central component of the preemption provision—that states may not enforce laws that relate to an airline's prices, routes, or services—and as the Court already explained, Defendants' collection of the Tax clearly relates to airline prices and services. Similarly, there does not appear to be an exception to ADA preemption, as Plaintiffs claim, for acts not governed by

federal law. It is irrelevant to the preemption inquiry whether an airline's activities are governed by federal law; the pertinent issue is whether the plaintiff's requested remedy would enforce state-imposed obligations or self-imposed obligations. *See Wolens*, 513 U.S. at 228 (finding that claims based on a state consumer fraud statute were preempted because that statute "serves as a means to guide and police the marketing practices of the airlines … [and] does not simply give effect to bargains offered by the airlines and accepted by airline customers"). Plaintiffs' claims of fraud and fraudulent concealment or omission, unjust enrichment, and money had and received are based on state-imposed obligations, so they are preempted by the ADA and must be dismissed with prejudice. *See Schenberger v. Air Evac EMS, Inc.*, 749 F. App'x 670, 678 (10th Cir. 2018) (affirming dismissal of unjust enrichment and money had and received claims based on ADA preemption); *Weber v. US Airways, Inc.*, 11 F. App'x 56, 57–58 (4th Cir. 2001) (dismissing a fraud claim as preempted by the ADA).

## IV.   CONDITIONAL MOTION FOR LEAVE TO AMEND

In their opposition, Plaintiffs include a conditional request for leave to amend the Amended Complaint should the Court find it deficient. Plaintiffs, however, have not included a proposed amended complaint, as required by Loc. R. 103.6(a), and they have not otherwise explained the nature of their proposed amendments. As a result, the Court is unable to make a determination as to whether amendment would be futile given its conclusions regarding the Amended Complaint's allegations of a RICO enterprise, an antitrust conspiracy, and a pattern of racketeering. *See Steinburg v. Chesterfield Cty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (stating that a court need not give leave to amend where "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the

amendment would have been futile" (internal quotation marks omitted)). Plaintiffs' Motion for Leave to Amend is therefore denied without prejudice.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or Transfer are granted, in part, and denied, in part, and Plaintiffs' Conditional Motion for Leave to Amend is denied without prejudice. The Court declines to transfer the case, and the Amended Complaint is dismissed without prejudice as to the RICO and antitrust claims and with prejudice as to the common law claims. A separate Order shall issue.


Date: November   12, 2019                                    /s/_____

                                                             GEORGE J. HAZEL
                                                             United States District Judge